Abby J. Ovitsky Plaintiff In Pro Se
6900 195th SW Avenue #133
Beaverton, OR 97007-5539
abby@parentadvocate.org

TRS: 503.207.0208
FAX: 866.276.7691



FILED
CLERK, U.S. DISTRICT COURT

DEC – 7 2011

CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

6
7
8            UNITED STATES DISTRICT COURT
9          CENTRAL DISTRICT OF CALIFRONIA
10

CV11   010142 DMG JCGx

11   ABBY J. OVITSKY, and DOES 1-10        CIVIL ACTION NO.
12              Plaintiff,                  COMPLAINT FOR
13        v.                                DECLARATORY AND
                                            INJUNCTIVE RELIEF, FOR
14   STATE OF CALIFORNIA DEPARTMENT OF      COMPENSATORY (BREACH
     FAIR EMPLOYMENT AND HOUSING, LOS       OF CONTRACT) AND
15   ANGELES POLICE DEPARTMENT,             PUNITIVE DAMAGES
16   COUNTY OF LOS ANGELES DEPARTMENT
17   OF MENTAL HEALTH, COUNTY OF LOS        A JURY TRIAL IS
     ANGELES CHILD AND FAMILY SERVICES,     REQUESTED
18   K12.COM dba K12, INC. dba CALIFORNIA
19   VIRTUAL ACADEMY dba CAVA, dba
     DELAWARE K12 INC., and ROES 1-10
20
21              Defendants.
22

23                    **INTRODUCTION**
24   1.    I bring this action against defendants for their failure to provide equal access for
25        deaf parents and deaf litigants to public schools run by Defendants K12

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR
COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES**

DEC - 7 2011

(hereinafter "K12", which refers to ALL the K12.com online public schools this defendant operates); for failure to provide equal access to residents of Los Angeles to police services by defendant Los Angeles Police Department, hereinafter "LAPD" including but not limited to failure of uniformed officers in the field to use TRS on July 10, 2008; for failure to use TRS service by Defendant County of Los Angeles Department of Mental Health (hereinafter "DMH") on the same day (SH and unnamed plainclothes officers refused and failed to use deaf services after repeatedly being asked to do so), by Defendant County of Los Angeles Department of Children and Family Services, (hereinafter "CPS") (this includes clerks, social workers, assistant social workers, "emergency" workers, case workers and counsel); and by State of California, Department of Fair Employment and Housing, (hereinafter "DFEH").

2. To date, five 2000C FCC complaints1 have been filed regarding these defendants' actions/omissions as well as three DFEH complaints, three civil rights complaints with County of Los Angeles, two OSPI actions (one in California and one in Washington State just to address parent revocation), and one IC32 complaint. Additionally, the original action was appealed twice. Defendants and each of them are well aware that there is an ongoing "problem." There has been no dialogue, communication or attempt to resolve these issues despite my diligent effort, for the past three years. I now file suit so that legal issues can be addressed, alleging that defendants and each of them have failed to provide equal access to their services by refusing to make use of TRS, a free public service for deaf that cost them nothing at all to use, by failing to make any reasonable effort to slow speech, lower

---

[1] The 2000C complaints are attached to this Complaint as Exhibits 2, 3, 4, 5, and 6.
[2] The IC3 is attached as Exhibit 1.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES**

1    volume including background noise, and/or to make use of written communication

2    (notes, email, faxes) upon written and oral request.

3    3.    Defendant K12, a for-profit corporation, currently and at all times alleged herein

4          has run PUBLIC online schools in about US 30 states; it enjoys publicity and

5          growing commerce from itself and others online.  K12 also offers for-fee classes in

6          some of these same states and in some states where it does not offer free public

7          online education.  K12 therefore is a private for-profit Delaware corporation which

8          comes into 30/50 states as a "guest," and uses local taxpayer money to fund

9          programs, some of which are discriminatory toward deaf parents.

10   4.    Based on the 2000 Census, more than 50 million Americans are deaf or hard of

11         hearing.  During the last few decades, the Deaf community in America has been

12         identified as a cultural and linguistic minority group. Approximately 85% to 90%

13         of children born to Deaf parents are able to hear.  Hearing children who have been

14         raised by Deaf parents have the unique experience of being bicultural and bilingual

15         members of the Deaf community. This presents significant issues for both Deaf

16         parents and school district personnel who provide educational services to hearing

17         children coming from Deaf parented families. Deaf parents repeatedly describe

18         how they are excluded from active participation in their hearing child's education.

19         Many Deaf parents report problems with school districts failing to provide

20         interpreters for routine parent-teacher meetings or other school functions. School

21         administrators are uncertain as to their legal obligations to provide communication

22         access for Deaf parents. In addition, teachers of hearing children from Deaf

23         parented families often have misconceptions about Deaf parents and their hearing

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR**
**COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES**

1    children. For example, some teachers presume that school age children who have

2    deaf parents are in need of speech therapy or special education services.3

3  5.  Telecommunications Relay Service, also known as TRS, Relay Service, or IP-

4    Relay, or Web-based relay services, is an operator service that allows people who

5    are Deaf, Hard-of-Hearing, Speech-Disabled, or DeafBlind to place calls to

6    standard telephone users via a keyboard or assistive device. Originally, relay

7    services were designed to be connected through a TDD (TTY) or other assistive

8    telephone device. Services have gradually expanded to include almost any generic

9    connected device such as a personal computer, laptop, mobile phone, PDA, and

10   many other devices. The first relay service was established by Converse

11   Communications of Connecticut in 1974.4

12 6.  Title IV of the Americans with Disabilities Act (ADA) - Telecommunications

13   services for hearing-impaired and speech-impaired individuals codified at 47

14   U.S.C. § 225, which mentions only TDD, is out of date.  TRS rules appear at 47

15   C.F.R. § 64.601 - § 64.606, § 64.611, and § 64.613, "FCC Regulations for the

16   Provision of Telecommunications Relay Services (TRS) pursuant to Title IV of the

17   Americans with Disabilities Act (ADA), Pub. L. No. 101-336, § 401, 104 Stat.327,

18   366-69 (adding Section 225 to the Communications Act of 1934, as amended, 47

19   U.S.C. § 225." TRS rules continue at § 64.601 Definitions and provisions of

20   general applicability.

21 7.  I have been using NEXTALK/UR RELAY since 2006 instead of a telephone for

22   the most part, since mid 2008 exclusively instead of a telephonic device.  Some of

23   NEXTALK's policies can be found on the sample TRS saved transcript provided

24   as Exhibit 7.

---

[3]Excerpted and summarized from http://coda-international.org/blog/wp-content/uploads/2010/07/CODA_InfoPacket.pdf
[4] http://en.wikipedia.org/wiki/Telecommunications_Relay_Service

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR
COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES**

8.  TRS is regulated by the FCC; they maintain a free, informative website about TRS5. In addition, some states (I do not believe California is one) have implemented "Don't Hang Up!6" educational campaigns. I do not know of any coordinated nationally funded mandatory "Don't Hang Up!" educational campaign or effort. I also do not know of any training program for court personnel, police, fire, ambulance/EMT, CPS, mental health, etc. We need one. Until then we have 42,400,000 hits on google for the words "how to make a text relay call" all of which explain how to do it.

9.  Just as government workers are expected to read, write and speak English, they are expected to be able to use deaf services that have been around since 1974. My personal experience is that Exhibit 7 is typical. Most people, even if they work for the government, even if they work for the FEDERAL government, still hang up or make excuses for not using it. This is a problem for me, because I cannot use a telephonic device, I am alone most of the time. TRS is the ONLY way I can make any live call. Even though TRS has been around for nearly 40 years, this kind of discrimination is only recently coming to the attention of courts.

10. A New Jersey jury recently awarded a deaf woman $400,000 in a suit based on her physician's failure to provide a sign language interpreter.7 "Providing for the Deaf, Hard of Hearing under the ADA, by Sam Diehl:

---

[5] http://transition.fcc.gov/cgb/dro/trs.html
[6] http://www.nyrelay.com/donthangup.htm (New York), http://www.washingtonrelay.com/hangup.html (Washington), http://www.nad.org/issues/telephone-and-relay-services/relay-services/message-businesses-dont-hang, (National Association for the Deaf ("NAD"), Vermont, http://www.relaytexas.com/pdfs/PleaseDontHangUp.pdf (Texas), http://thehealinglodge.vpweb.com/Video-Voice-Relay-System.html (Native American Interfaith), http://www.akrelay.com/PDF/news/AlaskaNewsJan13_06.pdf (Alaska), http://www.michigan.gov/mcsc/0,4608,7-137-8074_22503_23185-63419--,00.html (Michigan), http://www.wisconsinrelay.com/doa.html (Wisconsin), https://ist.berkeley.edu/calpbx/services/special-needs/relay_services (UC Berkeley),
[7] *See, e.g., Mary Pat Gallagher, Jury Awards $400,000 to Deaf Patient for Denial of Interpreter Services,* Law.com (Oct. 17, 2008) available at http://www.law.com/jsp/article.jsp?id=1202425326286&rss=newswire/

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES**

11. "…health care providers often fail to provide adequate communication services for the deaf and hard of hearing in compliance with Title III of the Americans with Disabilities Act (ADA). And attorneys are not much better. Since 2006, the Department of Justice has settled with 14 medical and law offices over ADA violations related to effective communication with the deaf and hard of hearing.[8] Many service providers, particularly smaller organizations, do not understand the ADA's legal requirements. Those who are not aware of the law may have the same reaction as one attorney who confidently documented his ADA violation by writing to a client, "I have never had to pay to converse with my own client."[9] Many smaller firms mistakenly believe that because there is a size limitation (15 or more employees) on the ADA's coverage of employers under Title I,[10] there is a corresponding limitation on the coverage of Title III. However, Title III contains no such limitation. Communication is critical to both medical and legal services. Under Title III of the ADA, individuals with disabilities are entitled to "full and equal enjoyment" of the services of a "public accommodation."[11] An "office of an accountant or lawyer…professional office of a health care provider, hospital, or other service establishment" are explicitly listed as a public accommodation under Title III.[12] The ADA includes both a prohibition and an affirmative duty. Public accommodations providers may not discourage or discriminate against individuals with disabilities seeking their services.[13] In addition, these organizations have an affirmative duty to "make reasonable modifications in policies, practices, or procedures"[14] and provide reasonable "auxiliary aids and services" necessary to

---

8 Various Settlement Agreements are available at http://www.ada.gov/settlemt.htm.
[9] http://www.ada.gov/settlemt.htm
[10] 42 U.S.C. § 12111(5)(A).
[11] See 42 U.S.C. §§ 12181-12189.
[12] 42 U.S.C. § 12181(7)(F).
[13] 42 U.S.C. § 12182(a).
[14] 42 U.S.C. § 12182(b)(2)(A)(ii).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR
COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES

1  serve individuals with disabilities.15 In this area, the biggest issue that arises for

2  individuals with hearing loss or deafness is determining which measures are

3  necessary to ensure effective communication. The specific practical changes or

4  auxiliary aids and service required depend on the needs of the individual.16

5  Additional costs incurred may not be billed to the client.17 Modifications to

6  policies or auxiliary aids or services, however, are not required if it "would

7  fundamentally alter the nature of [the] services..."18 Similarly, an auxiliary aid or

8  service is not required if it "would result in an undue burden."19 ***However, the fact***

9  ***that one option would result in an undue burden does not necessarily eliminate***

10 ***the obligation to ensure effective communication. There is likely an alternative***

11 ***auxiliary aid or service that would not result in an undue burden or fundamental***

12 ***alteration, but would still ensure effective communication to the maximum***

13 ***extent possible.20***" (emphasis added).

14 12.  The National Association of the Deaf (NAD), Stein & Vargas, LLP and Raymond

15 Marshall of Chason, Rosner, Leary & Marshall filed a lawsuit against BB&T Bank

16 in the United States District Court for the Eastern District of Virginia on behalf of

17 the Virginia Association of the Deaf, Inc. (VAD) and a deaf Virginia resident,

18 Melanie Williams. The lawsuit alleges that BB&T's policy of refusing relay calls

19 is a violation of Title III of the Americans with Disabilities Act and Section 504 of

20 the Rehabilitation Act of 1973. ***The lawsuit asks the court to order BB&T to***

21 ***adopt a policy where all incoming relay calls from people who are deaf or hard***

22 ***of hearing must be accepted in same extent that they accept telephone calls from***

15 42 U.S.C. § 12182(b)(2)(A)(ii).
16 Title III Technical Assistance Manual § III-4.3000-3600.
17 See 28 CFR § 36.301(c).
18 42 U.S.C. 12182(b)(2)(A)(ii).
19 42 U.S.C. 12182(b)(2)(A)(iii).
20 http://www.gpmlaw.com/uploadedFiles/Resources/Articles/Providing-for-the-deaf-hard-of-hearing-under-the-ADA.pdf

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR
COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES**

1    *hearing customers.[21]"*  (emphasis added). This is the same relief I am asking for

2    here, order all California CPS, police, fire, EMT, mental health, school admin,

3    public school teachers and court personnel to do the same.

4  13.  My argument here is that TRS is normally free, it requires little training, the main

5    skill needed is the ability to speak slowly, enunciate and follow instructions

6    prompted on each live call by the communications assistant (hereinafter "CA").

7    NEXTALK/UR RELAY (synonymous with "TRS provider") said they do train

8    workers upon request. (See Exhibit 7). I believe it would be relatively cheap and

9    easy to train all the people who not only hung up on me in 2008, but every time I

10    call now, and presumably are doing the same to millions of other deaf similarly

11    situated who use TRS, VRS or some similar service, making the government

12    services these hanger-upper clerks are hired to facilitate virtually inaccessible for

13    the average deaf person.

14  14.  It is a violation of the Equal Protection Clause of the Fourteenth Amendment to the

15    United States Constitution, as well as a violation of the Due Process Clause of the

16    Fifth and Fourteenth Amendments when the parties are unwilling to follow

17    established FCC and TRS provider procedures are court personnel, judges, police,

18    social workers investigating a police referral, EMT workers, firemen, and public

19    school administration.

20  15.  *NAD v. Nextalk*[22] talks about customers that require captioning to meaningfully

21    access the audio component of television and video content. "Just as buildings

22    without ramps bar people who use wheelchairs, video content without captions

23    excludes deaf and hard of hearing individuals. Closed captioning is a viewer

24    activated system that displays text on, for instance, television programming, or

---

[21] http://www.nad.org/news/2011/6/nad-sues-bbt-bank-denying-relay-calls
[22] Ibid.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR
COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES**

DVD movies. (This is different from open captioning, which is automatically displayed for everyone, such as subtitles in foreign language movies.) With closed captioning, deaf and hard of hearing individuals have the opportunity to enjoy movies and television shows by reading the captioned text. With closed captioning, these individuals can also watch videos together with family and friends, whether or not deaf or hard of hearing."[23] *How much more important is it to "get every word" when the topic is not entertainment for pleasure but the school principal, bank, landlord, EMT, policeman or the social worker (sometimes at the door uninvited), or court clerks and judges, on TRS, etc.? In other words, BASIC HUMAN SERVICES:   education, public safety, fire, public health, public housing, and equal access to justice?*

16.   Despite repeated requests to each defendant to train its staff in use of TRS, defendants and each of them have steadfastly hung-up, refused to use TRS, talked too fast for any operator to completely or reliably transcribe the conversations, despite many requests by TRS provider operators (CA requests) to slow down.

17.   Defendants and each of them have consistently interrupted despite many requests by TRS CAs not to interrupt or to wait for the "go ahead" etc.  Defendants and each of them are excluding deaf and hard of hearing individuals from equal access to essential services.

18.   Defendant County also avoided using deaf services entirely by holding "private court" in chambers, see below, which defeats the purpose of having a deaf service at a public court hearing.

19.   While it is true I can call 911 on TRS, I still cannot communicate with police when they arrive, because they do not know I've called on TRS, have no idea what

---

[23] Ibid.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES**

1  hyperacusis [24]or CAPD[25] is, and they refuse to make a reasonable accommodation
2  of written language or even slowdowns, pauses and repetitions. The average
3  police officer, social worker, lawyer and judge all say the same thing: "you can
4  talk so you must be able to hear." This is not true at all. Moreover, these people
5  are not DOCTORS. They do not know what I can hear and what I cannot hear. It
6  would be far, far easier for me to listen if I could, I cannot. I can read and write
7  competently, and I can type quickly and accurately, for me TRS makes the most
8  sense practically speaking. When virtually all the people I have to call in the
9  normal course of daily life hang-up, it's more than a nuisance, it amounts to
10 exclusion from society, increasing the sense of isolation and stigma that the
11 Americans with Disabilities Act ("ADA") was meant to redress for individuals
12 with disabilities.

13 **MYTHS REGARDING PEOPLE WITH HEARING LOSSES[26]**

14 There are many myths regarding people with hearing losses including, but not limited to:

15 *MYTH 1: "Everyone who is deaf or hard of hearing uses sign language."*

16 20.   FACT: "There are a variety of different sign systems used by hearing-impaired
17       individuals."[27] (See discussion above). Moreover, ASL in USA is not understood
18       by deaf in other countries, they use different ASL[28]. Since many of my
19       acquaintances are in other countries, it's much easier for me to email them in
20       English, whether they are deaf or hearing. I find ASL is not intuitive for me, it is

---

[24] http://en.wikipedia.org/wiki/Hyperacusis
[25] http://en.wikipedia.org/wiki/Auditory_processing_disorder
[26]http://en.wikipedia.org/wiki/Hearing_impairment
Myths About Deaf and Hard of Hearing. Tutorworkshop.org. Retrieved on 2010-12-10.
[27] What Do You Know About Deaf Culture?
[28] http://en.wikipedia.org/wiki/Sign_language...BSL, Auslan, NZSL, Danish Sign Language, Norwegian Sign Language, Icelandic Sign Language, Swedish Sign Language, Japanese Sign Language (includes Taiwanese and Korean), French Sign Language, Italian Sign Language, Quebec Sign Language, Irish Sign Language, Russian Sign Language, NGT (Dutch), Spanish Sign Language, Mexican Sign Language, LIBRAS (Brazilian), Catalan Sign Language, Austrian Sign Language, Hungarian Sign Language, Czech Sign Language...and this does not even begin to touch the continents of AFRICA or INDIA.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR
COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES**

like mime or "Charades," it's not verbal, I have to try to act out what I am saying until the other person guesses, it's not comfortable for me after 25 years as a legal secretary to have to guess what anyone means or says when we have written language.  Also, while charades or my ASL and lip reading might work at the synagogue, grocery store or a family gathering, it's not practical in court, or with police investigating a call someone else made, and it was not effective with CPS at all.  Other than signing the primary language form (Exhibit 15), CPS made no effort to acknowledge my hearing impairment.  Alvaro Campos, Phd (See Exhibit 13) stated in front of two witnesses, this is how CPS normally conducts business: it has no idea how to deal with deaf parents.[29]

21.  As many as 23% of U.S. adults are functionally illiterate, according to a 2002-3 study[30].  In a study conducted by Central Connecticut State University, Los Angeles was ranked #62 out of 75 cities for literacy[31].

22.  While 2 in 10 Americans are still illiterate, I expect police, fire, mental health, EMT/ambulance, social workers, nurses, doctors, school registrars, credentialed teachers, court clerks and judges to know how to read and write.  It does seem reasonable to me that these workers will able to read, write, and understand what "pause" "repeat" "slow/soft" and "lower volume" mean.

23.  FACT: "Individuals who experience hearing loss later in life usually do not know sign language." My APD caused by car accident/closed head injury in 2002, at age 44.

---

[29] He made the statement during the mental health exam held in July 2008, the other witness was a female employee of DMH. She was sent to facilitate, but had no idea what TRS is, what deaf needs are, etc.
[30] (PDF) Adult Literacy in America, Third Edition, National Center for Educational Statistics, April 2002, retrieved 2011-01-12
[31] http://www.ccsu.edu/page.cfm?p=5392

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES**

24. "People who are educated in the method of oralism or mainstream do not always know sign language." My parents aren't deaf. I AM NOT MUTE, nor are most deaf.

**MYTH 2: "People who cannot hear are not allowed to drive."**

25. "Deaf people may use special devices to alert them to sirens or other noises, or panoramic mirrors to enable improved visibility."32  I got my first driver's license in Los Angeles in 1978, have been driving ever since then, cars, trucks, trailers, I even flew a plane a few times (with a licensed pilot accompanying me.)  I have never had a single DUI, never injured a passenger in my car, have no outstanding tickets, am insured, and this is hundreds of thousands of miles I am referring to, mostly in California.

26. FACT: "Many countries allow deaf people to drive, although at least 26 countries do not allow deaf citizens to hold a driver's license."33  California is not one of these places…but LAPD still does not know this, I did get stopped in LA once during this time period and when I told the officer I am hearing impaired, he asked me if I "should be driving."

**MYTH 3: "All forms of hearing loss can be solved by hearing aids or Cochlear Implants."**

27. FACT: "While many hearing-impaired individuals do use hearing aids, others may not benefit from the use of a hearing aid."34  All aids hearing make noise.  Some "aids" amplify sound.  A hyperacute35 individual already has sound over-amplified, only earplugs help with this, but they make the APD36 worse.  What I

---

[32] Sound and Fury – Deaf Culture – Living with Deafness. Pbs.org
[33] Sound and Fury – Deaf Culture – Living with Deafness. Pbs.org
[34] Myths About Deaf and Hard of Hearing. Tutorworkshop.org
[35] http://en.wikipedia.org/wiki/Hyperacusis
[36] http://en.wikipedia.org/wiki/Auditory_processing_disorder

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES**

1   hear is a bit like what you might hear if you sat in the front row of the IMAX

2   theatre with the sound stuck on "maximum volume" and the speed just a little too

3   fast, about 20% too fast. Sounds can be heard but with some distortion because the

4   sound is too loud...this is a bit like static on the microphone when the speaker is

5   too close, too loud...the microphone screeches. Normally, whenever people talk to

6   me, my head screeches just like the microphone. I actually explained this to CPS

7   in person to Peter Ngo. I remember it in great detail, because it was my 50th

8   birthday.

9   28.   I had just spent 4 hours visiting with my son in a noisy CPS visitation room, and

10      my head was throbbing from sound, background noise, and the conversation, all of

11      it. Our birthdays are a week apart; I had brought birthday cake to share. All I

12      wanted and needed was to be in a quiet room. I told Ngo this, he said, while

13      making direct eye contact and nodding his head, "Oh, your head hurts," and kept

14      right on talking. The same day I told his assistant "I do not want to TALK to any

15      of you." There was certainly no obligation for any talking, and I was represented

16      by counsel, who advised no talking.  Any talking I did with CPS was under

17      extreme duress along lines of "if you ever want to see your only child again..."

18   29.   A month later, another CPS worker[37] spent about 20 minutes screaming at me,

19      while forcing himself upon me (standing close in a small room, yelling, insisting

20      that I "talk" and "listen" to him). I was there only to visit with my son. Politely

21      asking people to use written language was completely ignored. Nobody complied

22      until I started saying to each intrusive social worker, "Kindly shut your mouth and

23      let me visit with my son, we only have a few hours, it's our time to be together,

---

[37] Name is either Dario Robinson or Robinson Dario, got me to come to CPS on pretense of visit with my son. When I arrived, my son not there, but male social worker was there forcing himself on me in meeting room, yelling, threatening, and refusing to accept my disability.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES**

1    please email me with questions/suggestions."  Of course, then the CPS reports
2    started to say I was not communicating, when the opposite was true.  **THEY** were
3    not complying with a contract they signed to use written language.  Talking,
4    particularly under duress, does not rescind a contract that says "I can't hear and
5    you understand you need to use Relay," which is what Exhibit 15 says.  CPS
6    signed this contract then breached at every opportunity from that point on by
7    talking at me, making noise, having meetings in the nosiest possible rooms with
8    multiple TVs blaring, other kids screaming, and making it as difficult as possible
9    for me to communicate with them, with full knowledge (the audiology report, see
10   Exhibit 4).

11  30.  The audiology report was given to CPS by me by hand on July 10, 2008, the day
12       they literally barged into my private home without a warrant to snatch my son, who
13       was OUTSIDE watching them break the front door down, because I was screaming
14       after just being hit with a broomstick.  After I asked them repeatedly (via TRS to
15       dispatch) to stop making noise and use deaf services.  The audiology report is very
16       clear:  this person needs 100% written language.  Why is that so difficult for
17       government workers to understand, accept and do?  Why did CPS have to be
18       ORDERED by Edelman to USE email that they always had, two months after they
19       signed the written contractual agreement to use TRS Relay? (Court transcript
20       available).

21  31.  FACT:  "For some hearing-impaired individuals who experience distortion of
22       incoming sounds, a Cochlear Implant may actually **worsen** the **distortion**."38
23       (emphasis added). I have APD, which is a **distortion** of sounds, WORSENED by
24       **amplification** which **causes more sound distortion**.  It's already too loud for me to

---

[38] Myths About Deaf and Hard of Hearing, Tutorworkshop.org

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR
COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES**

1   understand what people are saying…too loud and too fast.  Based on six years of

2   my personal experience, the average clerk, judge, lawyer, doctor, educator, social

3   worker and police officer appear to act as if the request "please LOWER your

4   volume and SPEAK SLOWLY" is not reasonable, or at least, most of the people

5   most of the time cannot or will not speak slower or lower.  Would they, if there

6   were some government training about sound processing disorders? A court order

7   telling them to? A directive from the governor?

8   **MYTH 4: "A lack of hearing correlates to a lack of intelligence."**

9   32.   "A person's intelligence level is unrelated to whether or not the person can hear."

10       Examples of smart deaf people abound.39  I researched and wrote this entire brief

11       by myself.  I drafted and filed the other complaints by myself.  I also handled my

12       own social security appeal and several administrative appeals before that.  I have

13       one case on appeal in Thurston County Superior Court, State of Washington now; I

14       ask this court to take judicial notice of it, ***Ovitsky v. K12, et al.***, regarding parent

15       revocation, No. #11-2-01598-7.

16  **MYTH 5:  "All deaf/hard of hearing people are experts in Deaf Culture."**

17  33.   FACT: "Deaf people may have a variety of different beliefs, experiences, and

18       methods of communication."   I have always preferred to use WRITTEN

19       COMMUN-ICATION.  Now that there is internet, it is far, far, far easier than

20       "listening" to people "talk," which for me is often also physically painful.   I

---

- [39] Juliette Low - The founder of the Girl Scouts.
- Dummy Hoy - The first deaf major-league baseball player.
- Ludwig van Beethoven - Was completely deaf for the last part of his life and yet managed to produce some of the greatest music of all time.
- Cal Rodgers - The very first deaf pilot in the USA in 1911.
- Thomas Alva Edison - An American scientist, inventor, and businessman.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES**

1  consistently told CPS at every weekly visit attended that, "It is too loud FOR ME,

2  and I have hyperacusis." The misinterpretation that deaf "not listening" = "not

3  communicating" is not mine, from my perspective, I sent emails every day to CPS,

4  they went unanswered. Then CPS used every possible trick to corner me in their

5  office and talk at me, loudly, including telling me there was a scheduled visit

6  (twice) with my son, after I drove down to CPS and checked in, he was not there,

7  but a social worker was there, to yell at me. (DR and MP).

8  34.  FACT "The choice to become part of deaf culture may be influenced by the age at

9  which hearing was lost and the individual's personal background." I was 44 at the

10  time I lost the ability to process sound at a normal speed; I had already spent 25 or

11  more years as a litigation assistant. My typing, spelling and ability with written

12  languages had earned me a living for more than 30 years as an independent

13  woman, soldier[40], taxpayer, voter, homeowner, mother...I have no need to "learn

14  ASL," to me it is a confusing mélange of mime and charades, not a precise

15  language. I do mime a bit, I talk a bit, I finger spell, but I have far less difficulty

16  with written language than the average person in California seems to have. I

17  earned a BA from UC Berkeley in 1983, despite skipping most of the lectures,

18  because I could not hear.

19  *MYTH 6: "All deaf people want to be hearing."*

20  35.  FACT: "While some individuals with hearing loss want to become hearing, this is

21  not the case for everyone. Some take pride in their deafness or view themselves as

22  a minority rather than a disability group."41   While I am neither proud nor

23  ashamed of being literate, I simply have no desire to join a group. I am not lacking

24  anything. My son is not lacking anything. Our language at home may be a

---

[40] I served in Israeli Defense Force 1977-1978 in Haifa Naval station, dental dispensary for 11 months.
[41] http://ifmyhandscouldspeak.wordpress.com/common-myths-about-deaf-people-and-the-truth/

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR
COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES**

combination of written text, mime, some speaking, other visual cues (more focus on facial expressions, for example), and it is not the same language most CPS/DMH workers use at home, but it is a functioning language, *the main difference between me and any other person is my LANGUAGE is WRITTEN not spoken.  This is DIFFERENT NOT LESS THAN.*

**MYTH 7:  "People who can't hear can't use a phone."**

36.     FACT: I used a phone for 50 years then disconnected it because I got tired of asking people to slow down and lower volume.  I could not understand what people were saying and when they yelled into the phone, it just gave me a migraine headache.  I am not willing to "take a pill" for a headache when I can avoid the headache by avoiding the sound.  I began using TRS in 2006 after seeing Judy Paton, California licensed audiologist.  I saved most of my calls from the time I first started using the service, most of the calls since 2006 are still on TRS provider's server.  The saved TRS call transcripts tell a very interesting story.  Most of the people answering TRS do not listen to the operator; they hang up, talk too fast, or read a script.

37.     There is one transcript[42] of me communicating with Contra Costa CPS in Northern California, they told me for about half an hour that I am in hospital.  I was calling from home the entire time that the authorities who had taken my son then were informing me about my own whereabouts!  It still took them half an hour to realize I am me, even if I "speak" through a CA and TRS while typing, because they did

---

[42]Some time in fall 2006, Northern California Kaiser called Contra Costa County CPS, misstated to CPS that I was "admitted to County Mental Health," and in fact I was home asking for my son back, he was released within 48hours, at great expense (for lawyers fees) at the time, that is when I began studying law informally.  While Kaiser N. California is not a party here because the actions alleged that are attributed to Kaiser occurred over six years ago, these allegations re TRS certainly do include Kaiser of N. California, but not Kaiser of S. California, Washington or Oregon, for example, there was no mistreatment of me at any of those other facilities, only the N. California facility, which insisted I'm not deaf.  I might be able to produce the saved call if it is on the TRS provider's computer.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES**

1    not and do not understand deaf parents' needs, not just in Los Angeles, but in all

2    counties throughout the State of California.

3  38.   It took the school registrar at K12's school in Washington State 20 minutes to

4    understand the TRS provider's explanation of relay (refer to exhibits to that case

5    see above.)

6  39.   In another such call, a psychiatrist[43] from Kaiser HMO told me repeatedly that I

7    am angry, while I continued to tell him I am no such thing.  The doctor continued

---

[43] I did not request a psychiatric consultation in 2006. I was referred by N. CA Kaiser for "stress" as a condition of having temporary disability (SDI) to live on, Kaiser signed for State disability and told me to communicate with this psychiatrist; I requested deaf services, so we connected on one of my first TRS calls. I had just been fired, again, after asking my last boss (Bill Goodman, Esq.) to stop yelling at me because it hurts my head. The psychiatrist had never seen me, never heard my voice, and never personally by himself ever observed me talking or trying to "listen/attend." He had been TOLD by others that I am loud/angry. *He assumed loud is due to anger*, not some kind of hearing impairment, being deaf, not hearing my own volume. He assumed these things, IMHO, due to the very narrow bias of his own inadequate continuing medical training, which is mandated by the Department of Health of the State of California, Community Care Licensing. In other words, both the voters and the State legislature of California expect doctors to know the difference between loud/deaf and loud/angry, if he's going to call himself a "doctor."
    The main problem Kaiser had was loud patients are bad for business. They upset the cue. Other patients have ignorant judgments. Instead of educating everybody with its existing medical education department about needs of deaf, Kaiser calls security and has deaf arrested, this also happened once. By the time Kaiser's psychiatrist got my file, he had read remarks written by many casual observers (possibly not even by doctors) in my medical records. He accepted this as fact and attempted to impose "feelings" upon me (as do many people) that were no more than mistaken, ignorant first misimpressions projected upon me by others who do not know me and did not know me when they made the observations . Nobody who knows me well seems to think I am angry. See FaceBook and Branchout endorsements, for e.g., also my eBay and Amazon profiles. Ask my neighbors. Ask my clergy. The sheer number of these old unfounded reports proves only one thing: there is a lot of ignorance in HMO medical centers and elsewhere about deaf. There is not enough deaf education awareness.
    Witnesses to these events are C. Zadik Shapiro, Esq. and the other female lawyer who represented me that year, whose name can be produced (not Foley, see below).
    Prior to 2006, I had sought "treatment" for fatigue, was often referred to psychiatry and instead of getting relief, I was prescribed various patent medicines which caused far MORE harm than good and some side effects from those unnecessary medicines may have contributed to my permanent hearing loss, according to House Ear Institute in Los Angeles. Kaiser may also itself have inadvertently caused some of the damage by yanking out surgically implanted ear tubes in Honolulu, HI Kaiser when I was a child there. There should be a record of that, from 1966 or thereabouts.
    *In 2006, Northern California Kaiser did properly diagnose me with chronic obstructive sleep apnea, I began CPAP use, and fatigue since then with continuing CPAP use has been much less.* APD/hyperacusis, allergies, asthma and chronic pain secondary to congenital scoliosis explain all other systems ever complained about to any doctor and provided a secondary and tertiary basis to justify SSDI (permanent social security disability insurance benefits based on time worked and premiums paid by me) in 2009 for CHRONIC PHYSICAL medical problems, most of which actually have a strong genetic component but which did not get diagnosed until 2006 because I overcompensated, worked, and came from an immigrant family that counseled me to avoid doctors. I am an only child and first generation American as well, my father born in Poland. I spent half my child hood growing up in a third world country, Israel and the other half growing up in a new State, HI. In the 60s HI had a very strong Asian influence; use of alternative medicine was prevalent in HI long before it "caught on" in California. My own Jewish tradition also has a long history of herbalism/naturopathy instead of allopathy, dating back 5,000 years or more. My parents used home remedies; they kept Kaiser HMO insurance for "emergencies," and lived long lives, my mother is still alive as of this writing, is 94.8 years old and lives independently with chronic pain.
    SSDI was approved based on "severe hearing impairment" in 2009, RETROACTIVE to 2006 based on the same audiology study (Paton, 2006) that Kaiser rejected, only because APD and hyperacusis were conditions not covered by Kaiser's policy in 2006 with Bill Goodman, Esq. (last full time employer) which covered me then. Los Angeles County/State of California also had no audiologist for me to see when "investigating" my disability claim in 2007, delaying payment until

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES**

1   to talk with the operator as if I was not even on the call.  The transcript reads like

2   two people having two separate, parallel conversations, with no reciprocity or

3   "listening" going on at all, nobody is "hearing" or "understanding" there is no

4   connection between the parties to the call.[44]  The doctor did not hear or attend to a

5   single word I typed/relayed, not one.  It was not until I began using TRS that I

6   began to see how average people communicate—or do not communicate.  TRS and

7   email are now my main forms of communication; they provide clarity, honest

8   feedback and accountability for me.  I have no motivation or reason to "want to

9   hear better" or "get treatment."  I have made, in the six years since my audiologist

10  introduced me to TRS, nearly ten thousand TRS calls in six years.  When the other

11  parties cooperate with "slow," "low" and/or WRITTTEN LANGUAGE requests, I

12  self-express more effectively than I ever have before.

13  ///

14  ///

---

mid 2009, when I waited my turn to have a federal appointed MD review it. Paton practices in California and was available to appear as a witness in 2008 to defend her report. Nobody called her. The same is true of Zinn (Zinn's report is an exhibit on file in both the 2008 Edelman dependency matter as well as in the aforementioned Thurston County administrative appeal. Zinn practices in California and is available to defend her report. *Zinn says there was no ADHD in 2006, contradicting several Kaiser doctors and directly contradicting Commissioner Trendacosta's "baloney" ruling of 2008. Zinn was never called to defend her report and it remains unchallenged. Moreover, Zinn is still a top expert in her field, music and gifted education.*)

    In 2006, Kaiser refused to accept that severe hyperacusis + APD together =deaf. N. California Kaiser and County (Los Angeles) *insisted on forcing dangerous psych treatment upon me*, and on my son, until I refused all the treatment and my son *independently* also refused all treatment, starting at age 11. We were separated at the time he first started refusing, by an educational placement outside the home, a residential weekday placement, sort of State-run "boarding school," also unnecessary, overpriced and extremely counter-productive, my understanding is one year of "boarding school," cost taxpayers $100,000 at least. I first revoked permission in writing in the form of a confidential settlement agreement, shortly after learning the true cost of the residential educational placement, after visiting the school and observing my son there. I felt and feel now strongly it is a supreme waste of taxpayers' money. When I so reported to the Contra Costa IEP team, one of the County workers said, "what do you care? You're not paying." All of this to that point was under duress of CPS and more CPS if I did not blindly and deafly agree to County's imposed "opinion" of how I was to educate my own and only child. I was never confined against my will. CPS (Asst. DA Leftwich misrepresented to judge in 2008 that I was confined without checking facts first with MP, who later verified there was no involuntary confinement, I waited for the doctor to evaluate me, and left, that was it, Kaiser N. California made a false police report to Santa Clara County Sheriff at that time, it was sorted out within 2 days or less, still creating a great deal of unnecessary "stress.") *Since this is a complaint about use of deaf services and about <u>language</u>, not a malpractice suit, this information appears here as a footnote. I never sued Kaiser for malpractice, because my son still is covered by Kaiser now as of this writing, and Kaiser could still retaliate.*

[44] Similarly, when court clerks or judges talk too fast for the CA to transcribe, what I read is "(too fast)" not the actual words spoken, and I have no idea still what went on, no chance or opportunity to object, etc.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR**
**COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES**

1   **MYTH 8: *"Everyone who cannot hear can lip read."***

2   40.   FACT: "Only about 30% of spoken English is visible on the lips."45 I get less
3         because I did not start trying to lip read until six years ago, but was apparently
4         doing it in 2006 to some degree as a crutch because Paton points it out in the
5         report. I also do some lip reading to watch videos or films. If there are no closed
6         captions and there are no face/headshots, I still can't understand it. What I hear is
7         blurry sound, not language, see above and footnotes.

8   41.   County of LA trier of fact did make a pointed comment in the record about my not
9         "reading CART," every moment of the hearing (see Exhibit 16) showing 1. He's
10        trying to second guess my doctor INSTEAD of reading the doctor's report which
11        was in evidence; 2. He's not understanding that I hear sound, but cannot
12        understand most of it, unless there are pauses, then I can "catch up," like a stroke
13        victim…I need a few more moments to process…not always a repetition; 3. ***He is***
14        ***assuming facts not in evidence instead of examining evidence to distill facts,***
15        ***which is his job; he's therefore failed to be a trier of fact.*** A fast repetition is just
16        as bad as no repetition; it's a blur of sound46. I hear sound like we see an abstract
17        painting: blurry but not without texture, however, meaning is very questionable,
18        unreliable, subjective and depends on things like background noise, how much
19        physical pain I am in at the moment, presence of bright lights, perfumes, attributes
20        of speech like pitch, pace, how speaker is turning his/her face so I can see lips,
21        what they are doing with hands, and timing. I have never relied on my hearing for
22        understanding others, not ever.   When the requested ADA accommodation is

---

45 http://www.imdb.com/title/tt1125387/
46 (See for example books on this topic "Like Sound Through Water: A Mother's Journey Through Auditory Processing
Disorder [Hardcover]" by Karen J. Foli (Author), Edward M. Hallowell (Author) available on Amazon at
http://www.amazon.com/Like-Sound-Through-Water-Processing/dp/0743421981, *See Also* "When the Brain Can't Hear :
Unraveling the Mystery of Auditory Processing Disorder," by Teri James Bellis (Jul 22, 2003) available at
http://www.amazon.com/When-Brain-Cant-Hear-Unraveling/dp/0743428633).

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR**
**COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES**

1   SLOWER, most people seem to say, "I don't have time for this." I argue "slower"
2   for people with APD is NOT UNREASONABLE! I also argue "faster," will not
3   lead to saving time when it concerns me or anyone similarly situated with a similar
4   hearing difference.

5   42.   FACT: "Lip reading requires not only good lighting, but also a good understanding
6   of the spoken language in question and may also depend on contextual knowledge
7   about what is being said." (wiki)  Not only that, it requires good *eye* sight. I have a
8   severe astigmatism, do not wear bifocals and if I've got the wrong glasses on I
9   cannot see lips, they too are blurry.

10  43.   Riverside PD felt the need in early 2009 to find out if I needed some more "mental
11  health services," because the officer said, "it seems like a mental illness to me."
12  This was after a roommate called 911 to make another false police report, after I
13  yelled at her to leave me alone, and slammed a door during a routine argument
14  about noise and boundaries at home.  The officer came into my room, knocked the
15  door off the hinges, (again no warrants) then pulled out his 5150 wallet card and
16  yelled it at me, he had to repeat it three times, because I did not have my glasses
17  and he would not let me get them, even after I explained I am deaf and need to see
18  lips but that yelling does not help and actually makes it worse.

19  44.   A few months later, another officer in San Bernardino handcuffed me and shoved
20  me into a squad car because I would not "talk" to her because I cannot hear, after
21  another false 911 call from a roommate/landlord. This was after I told her I need
22  an ADA accommodation and my lawyer, and told her the lawyer's name.  After
23  she let me go, she called CPS in retaliation for my reporting her, to tell them
24  (falsely) I cannot communicate with my child.  She knew it was false when she
25  made the report because she herself had observed us communicating. Nothing

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR
COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES**

1    came of this; fortunately her boss did use email.  Should she also be "immune"

2    from discipline? Three witnesses saw her do this.

3  45.  I also had a lawyer (Shapiro again) in July 2008 in LA, the same lawyer, CPS

4       refused to use him to communicate better.  For the most part, no arrests were made,

5       just constant harassment.

6  46.  When I was in the Seattle area, however, there was a story of Seattle PD shooting

7       and killing a deaf man, who was at the time unarmed and not aggressive.[47]

8  47.  It's just not like in the movies where deaf can read lips across a big room and get

9       every detail of the conversation, they can't.  At least, I have never met any real

10      person with those "Hollywood" lip reading skills.  A much more accurate picture is

11      painted by the TV series "Switched at Birth.48"  Nobody has the right to

12      reasonably demand of all deaf to "just read lips."

13  **MYTH 9: "Most deaf people have deaf parents."**

14  48.  FACT:  "Less than 5% of deaf children in the United States have a deaf parent."

15      (wiki).  My parents were not deaf, worked and paid taxes for over 50 years in the

16      USA and have had some sound sensitivity, but never thought of it as a "disability."

17      If anything they minimized it, but they always worked together in a family

18      business, never held 9-5 jobs for long.

19  49.  The failure of defendants and each of them to provide equal access to millions of

20      deaf and hard of hearing individuals violates the mandate of the ADA to provide

21      "full and equal enjoyment" of a public accommodation's goods, services, facilities,

22      and privileges, including "sales or rental establishment[s]," and "service

23      establishments."

---

[47] http://www.rawstory.com/rs/2010/12/23/court-releases-video-deadly-police-shooting-native-american-seattle/
[48] http://www.imdb.com/title/tt1758772/

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR
COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES**

50. This privilege includes the right to examine evidence, to confront prosecution witnesses at trial, it includes a competent legal defense, and full cooperation with Title III and Title IV, all of which I was totally and completely denied, after making a repeated request for five months and waiting patiently. MP, the CPS investigator was twice asked to come to court to be examined. Twice she failed to show. I specifically told counsel NO DEALS, I want to examine her; I have a right to examine her. She did not show up, judge was frustrated, to say the least, I saw his face say "Why?!" then on December 3, 2008, everybody disappeared into chambers for HOURS, I waited with my son in the hallway, this was a very common occurrence at each and every hearing, we waited for hours, they did something not seen or heard inside. On December 3, 2008, when we went back in, judge told me I was full of baloney and gave the child back. This "baloney" comment is not only in the final transcript (See Exhibit 16) it was quoted as "case law" by the 2nd Appellate District, in 2009, without any examination of the evidence, ever! The second appointed lawyer told me "Your case is closed. Go home." In my book, closed and dismissed are two different things. The County's failure to allow me to examine the one witness who had falsified evidence, suppressed exculpatory evidence (MP intentionally and maliciously suppressed and misquoted the expert reports), and her egregious behavior should not go undisciplined or unnoticed any longer.

**QUALFIIED IMMUNITY**

51. A mom in Orange recently was awarded $4.949 million for the very same behavior by CPS there, and the jury there found that ***"there was no error in rejecting qualified immunity in this case."*** It is one thing to be free enough to do a

---

[49] http://www.prweb.com/releases/Fogarty-Hardwick/social_services/prweb4157254.htm

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR
COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES**

1    necessary but unpleasant job, state workers need *some* immunity, and sometimes
2    the means does justify the end *when* there is imminent danger. It is quite another
3    thing to HIDE behind it, to use "qualified government immunity" like "Harry
4    Potter" uses "a cloak of invisibility," to disappear from any reasonable
5    responsibility for completely irresponsible, self-serving, malicious and reckless
6    actions taken against taxpayers paying these very persons who caused the abuse!
7    (See Exhibit 1, IC3 allegations, and complaints about social workers, mental health
8    nurse, foster parents and lawyers abusing their authority throughout this case.)
9    Qualified immunity is just that, it's QUALIFIED, it's never absolute. This worker,
10   like all the others work for taxpayers, they are paid by taxpayers, such as me. Hold
11   them accountable here to taxpayers.

12   **THIS ACTION IS TIMELY FILED AND ANY STATUTE PROBLEM**
13   **SHOULD BE EQUITABLY TOLLED DUE TO DEFDANTS' ACTIONS.**

14   52.   TRS, like Netflix, is an internet service. Because the Internet is a place of public
15         education, of public justice, of business/public trading, it is a "service
16         establishment," as it relates to online public schools, access to courts, and access to
17         local government services. Denial of equal access to the internet, to online public
18         schools, to local City and County services, violates the ADA. Remedying that
19         violation is critical to the ADA's goal of providing people with disabilities the
20         same access that others take for granted. Accordingly, I seek injunctive and
21         declaratory relief to ensure that deaf and hard of hearing individuals have equal
22         access to all of these services. It is not that services were not offered. Useless
23         unwanted and medically unnecessary services were FORCED and no
24         communication occurred for long periods of time because the defendants and each
25         of them refused to use TRS, to wit, WRITTEN COMMUNICATION. They

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR**
**COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES**

refused to SLOW down a bit.  They refused to READ.  They refused to be patient.
I do not sign in ASL.  I cannot read lips.  I am older.  I am educated.  I can read.  I can type.  Can they?  Then why didn't they?  After they signed a written CONTRACT that says they understand the importance of doing so in the situation?

## NATURE OF THE DISABILITY AND ADA ACCOMMODATIONS

53. *What is Hyperacusis?*

"Hyperacusis (also spelled hyperacousis) is a health condition characterized by an over-sensitivity to certain frequency ranges of sound (a collapsed tolerance to normal environmental sound).  A person with severe hyperacusis has difficulty tolerating everyday sounds, some of which may seem unpleasantly loud to that person but not to others." (wiki).  For me personally it is high pitched sounds and repetitive sounds.

54. *What is Auditory Processing Disorder?*

"The American Speech-Language-Hearing Association (ASHA) published "(Central) Auditory Processing Disorders" in January 2005 as an update to the "Central Auditory Processing: Current Status of Research and Implications for Clinical Practice (ASHA, 1996)"[4]. The American Academy of Audiology has released more current practice guidelines related to the disorder[5]. The UK's Medical Research Council has also defined the disorder in a pamphlet, [6] Auditory Processing Disorder (APD) pamphlet, Oct 2004.[7] (wiki)

55. Auditory processing disorder can be genetic or acquired. It may result from *ear infections, head injuries* or developmental delays that cause central nervous system difficulties that affect processing of auditory information. This can include problems with: "...sound localization and lateralization (see also binaural fusion); auditory discrimination; auditory pattern recognition; temporal aspects of audition, including temporal integration, temporal discrimination (e.g., temporal gap

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES**

1    detection), ***temporal ordering, and temporal masking***; auditory performance in

2    competing acoustic signals (including ***dichotic listening***); and auditory

3    performance with degraded acoustic signals."[8] (wiki) (emphasis added where I

4    recognize my own weaknesses).

5    56.    "***Characteristics of APD***:

6    • ***have trouble paying attention to and remembering information presented orally,***

7    ***and may cope better with visually acquired information***

8    • ***have problems carrying out multi-step directions given orally; need to hear only***

9    ***one direction at a time***

10    • ***have poor listening skills***

11    • ***have language difficulties (e.g., they confuse syllable sequences*** and have

12    problems developing vocabulary and understanding language)

13    •***need more time to process information***" (emphasis added where I recognize my

14    own weaknesses).  (wiki) Is asking for "more time to process information" unreasonable

15    in this context? Does Congress say it is?

16    57.    "***What is the Individuals with Disabilities Education Act (IDEA)?***

17    The Individuals with Disabilities Education Act (IDEA) is a United States federal law

18    that governs how states and public agencies provide early intervention, special education,

19    and related services to children with disabilities. It addresses the educational needs of

20    children with disabilities from birth to age 18 or 21[1][2] in cases that involve 14

21    specified categories of disability."  (wiki)

22    58.    "***What is Americans with disabilities?***

23    Census 2000 counted 49.7 million people with some type of long lasting condition or

24    disability. They represented 19.3 percent of the 257.2 million people who were aged 5

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR**
**COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES**

and older in the civilian non-institutionalized population -- or nearly one person in five..."[1] (wiki)

59.    *"What is No Child Left Behind Act?*

Aside from the many issues identified in this wiki article, local governments have a tendency to punish parents with it, resulting in family disunity and in misdirected services being forced or coerced onto some families that do not need them.  As there is no such thing as "No Parent Left Behind" at this point, I rely on the Americans With Disabilities Act for relief." (wiki)

60.    *"What is the Americans with Disabilities Act of 1990 (ADA)?*

The Americans with Disabilities Act of 1990[1][2] (ADA) is a law that was enacted by the U.S. Congress in 1990. It was signed into law on July 26, 1990, by President George H. W. Bush, and later amended with changes effective January 1, 2009.[3]  Those changes include PARENT REVOCATION (see *Ovitsky v. K12*, filed in Thurston County, Washington, pending oral argument in April 2012, Case 11-2-01598-7)." (wiki)

61.    *"What is TRS?*

Telecommunications Relay Service, also known as TRS, Relay Service, or IP-Relay, or Web-based relay services, is an operator service that allows people who are Deaf, Hard-of-Hearing, Speech-Disabled, or DeafBlind to place calls to standard telephone users via a keyboard or assistive device. Originally, relay services were designed to be connected through a TDD (TTY) or other assistive telephone device. Services have gradually expanded to include almost any generic connected device such as a personal computer, laptop, mobile phone, PDA, and many other devices. The first relay service was established by Converse Communications of Connecticut in 1974."  (wiki)

62.    *"What is Communication Access Real-Time Translation? (CART)*

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR
COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES**

1 | Communication Access Real-Time Translation (CART), also called open captioning or
2 | real-time stenography, or simply real-time captioning, is the general name of the system
3 | that court reporters, closed cautioners', and others use to convert speech to text. A trained
4 | operator uses keyboard or stenography methods to transcribe spoken speech into written
5 | text." (wiki)

6 | 63.  *"What is e-learning?*

7 | E-learning comprises all forms of electronically supported learning and teaching.
8 | The information and communication systems, whether networked learning or not, serve
9 | as specific media to implement the learning process.[1] The term will still most likely be
10 | utilized to reference out-of-classroom and in-classroom educational experiences via
11 | technology, even as advances continue in regard to devices and curriculum.

12 | E-learning is essentially the computer and network-enabled transfer of skills and
13 | knowledge. E-learning applications and processes include Web-based learning,
14 | computer-based learning, virtual education opportunities and digital collaboration.
15 | Content is delivered via the Internet, intranet/extranet, audio or video tape, satellite TV,
16 | and CD-ROM. It can be self-paced or instructor-led and includes media in the form of
17 | text, image, animation, streaming video and audio." (wiki) Note please this article also
18 | states that the history of e-learning dates back to 1960s at Stanford University, with their
19 | Education Program for Gifted Youth, which is how I found out about it as a parent-
20 | educator.  Note further that in 2008, some 4 DECADES later, DA Leftwich is still
21 | incredulously announcing to judge that "online school cannot be real." (See court
22 | transcript of July 2008 hearing, available from me or Edelman.)  Judge does not question
23 | her, defense attorney says nothing despite having been given multiple confirmations of
24 | enrollment prior to this date and I popped up and said, "it is a charter school," which
25 | judge ignored, but it's in the record. I was at every step of the way treated as guilty until

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR
COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES**

1 | proven innocent, even when the exculpatory evidence in the record clearly stated
2 | otherwise, but nobody bothered to READ IT for months.  A simple Wikipedia search
3 | online by investigator MP or by Asst. DA Leftwich would have allowed her to educate
4 | herself instead of perjuring herself.

5 | 64.   References here to "online school," refer to K1250, which provides a PUBLIC e-
6 | learning environment for students, taught by licensed credentialed teachers.

7 | **JURISDICTION AND VENUE**

8 | 65.   The statute of limitations in California for a lawsuit on a contract is *four* years.
9 | CCP §337[51].  The instant action is timely for breach of contract, federal question,
10 | diversity jurisdiction and arguably the statute for personal injury should be
11 | equitably tolled due to defendants' own actions.

12 | 66.   This Court has subject matter jurisdiction (federal question) over this action
13 | pursuant to 28 U.S.C. § 1331 and 42 U.S.C. 12182(b)(2)(A)(ii), as well as the
14 | parent revocation issue, still not settled, nor likely to be settled in State Court.

15 | 67.   Venue is proper in this District, pursuant to 28 U.S.C. § 1391, because Defendants
16 | and each of them operate businesses and agencies in this District, and have
17 | sufficient contacts to be subject to personal jurisdiction in this District. A
18 | substantial part of the acts or omissions giving rise to my claims has occurred in
19 | this District.

20 | 68.   Assignment to the Central Division is appropriate pursuant to General Order No.
21 | 02-06 of the Local Rules of the United States District Court for the Central District
22 | of California because the only parties residing in this District reside in the Central

---

[50] http://www.k12.com/, ONLINE PUBLIC SCHOOL and http://www.k12.com/cava/contact-us in California.
[51] The statute of limitation may be suspended, e.g., by minority, insanity, imprisonment, absence from state, or absence in times of war. [See, e.g., CCP §§351, 352, 352.1, 354.] A limitation period also may be tolled by parties' written agreement [see CCP §360.5], *or may be equitably tolled when the defendant's conduct contributed to the plaintiff's delay in filing suit. [Bollinger v National Fire Ins. Co. (1944) 25 C2d 399, 411.] Tolling under CCP §351 for absence from the state* does not apply to claims arising from motor vehicle accidents involving nonresident motorists. [Litwin v Estate of Formela (2010) 186 CA4th 607, 616–617.]

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR
COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES**

1  Division. I reside in the Portland, Oregon metropolitan area. I will need to attend

2  by TRS/Phone Appearance, because I cannot easily travel and CART is not

3  equivalent to TRS, I cannot slow CART down or re-read CART, it does not work

4  for my needs. An appropriate ADA request will be made before the first hearing in

5  this matter.

6  THE PARTIES

7  69.  I am a native California and was a resident of State of California from 1958-1963

8  and from 1978-2010, when I moved permanently from the State. I resided in the

9  State of California during the period of time in which these events occurred. I now

10  reside in the State of Oregon.

11  70.  Defendant K12, having a main office at 2360 Shasta Way Simi Valley, CA 93065,

12  is listed with the California Secretary of State as "K12, INC., WHICH WILL DO

13  BUSINESS IN CALIFORNIA AS DELAWARE K12 INC." is a FOR PROFIT

14  corporation incorporated under the laws of Delaware and, is licensed to do

15  business in California, and to my knowledge, is also licensed to do business in 29

16  other states as well, providing public school services in many states, hereinafter

17  referred to as "K12."

18  71.  Defendant, Los Angeles Police Department is a Municipal government entity;

19  72.  Defendant, County of Los Angeles Department of Mental Health is a County

20  government entity;

21  73.  Defendant, County of Los Angeles Department of Children and Family Services is

22  a County government entity;

23  74.  Defendant, State of California Department of Fair Employment and Housing is a

24  State government entity;

25  75.  Plaintiff Abby J. Ovitsky is a deaf individual

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR
COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES

SEQUENCE OF EVENTS: A BULLET SUMMARY OF FACTS

76.  • October 2006: I revoked consent for further special education hereinafter ("SPED") services for my son with help of attorney Susan Foley, Esq. I rely on two expert opinions to do this. Expert reports are read and accepted; nobody challenges them or calls the experts to court. This is still true to this day. There is no standard form placed in student's file, "agreement" to accept parent's revocation is marked "confidential." I cannot release the confidential agreement without consent of the other signatories. There is therefore no proof of parent revocation in the public student file. The same month I am diagnosed with a severe hearing impairment by Judy Paton, audiologist and with chronic obstructive sleep apnea by Northern California Kaiser.

77.  • March 2007: I relocate to my "home" town, Los Angeles, legally enroll my son in K12, which operates in California as a State licensed charter school. My son works at grade level, does not take STAR52 exam this year. K12 asks me for his last IEP, I tell them I have revoked consent for SPED. They confirm with Steve Collins that I revoked consent. No services are provided, nor does K12 ask me to sign any more forms, there is no IEP form I am given for review and signature. K12 simply enrolls my son in school.

78.  • May 2007: I apply for Social Security Disability Insurance, based on Paton audiology report which previously diagnosed severe hyperacusis, central auditory processing disorder and tinnitus, adding previous diagnoses as well of chronic obstructive sleep apnea, chronic pain secondary to scoliosis, and asthma. There is no psychiatric diagnosis. Los Angeles insists it is a psych disorder, second guessing the audiologist. LA has no audiologist to send me to in order to confirm

---

[52] http://en.wikipedia.org/wiki/Public_Schools_Accountability_Act

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES**

1    the diagnosis.  Neither does Social Security.  Benefits are denied, I file a notice of

2    appeal.

3  79.    ● May-June 2008.  My son takes STAR53 exam in California and scores in top

4    1% for English and in top 3% for math in the State of California.

5  80.    ● July 2008.  I am sued by LA County for, among other things, "educational

6    neglect!"  I immediately notify the court I am severely hearing impaired, they sign

7    Exhibit 15 and order CART for court, then completely ignore CART by holding

8    private court in chambers.  I do not even get served with a copy of the Petition

9    until 2009, during the first appeal.  Halfway through the case, the County begins

10    proselytizing, by having Dario place my son in a Catholic home where mostly

11    Spanish is spoken.  The family tries to get him to eat pork, refusing to give him any

12    kosher food, he gets sick and this is in court record.  They also drag him to mass,

13    against his protests and mine.  We have to go to court to argue in front of judge

14    that this is not okay because I am a practicing Jew, and said so at the beginning of

15    the case, in fact asked the County for a temporary JEWISH placement, they said

16    they did not have one, this was not true.  There was a Jewish family asking to take

17    him, CPS refused because my son said, "too many rules."  Such as we have at home

18    now:  read instead of looking at TV, no junk food, no unkosher food, pray, and

19    have a stay-at-home mom.  CPS offered:  working single parents (half the

20    placements were with single parents), TV, lots of junk food (particularly pizza), all

21    unkosher food and discouraged him from going to the library or being a Jew in any

22    way they could, while telling him for five months that his mother is not deaf, she's

23    mentally ill and needs "talk therapy" even FOUR MONTHS AFTER Dr. Alvaro

24    Campos, LA County said talking would not help a deaf person, Dr. Campos' letter

---

[53] http://en.wikipedia.org/wiki/Standardized_Testing_and_Reporting

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR
COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES**

1    is one page long, they could not read it?  The letter is reproduced as Exhibit 13.

2    Campos stated in July 2008 in front of a DMH witness: "CPS does not know how

3    to deal with deaf parents."   The witness was supposed to "facilitate"

4    communication.  She had no idea what TRS was and expected me to talk/listen to

5    the doctor with her "help," knowing I do not sign, cannot hear her, etc.  She did

6    witness the statement, "CPS does not know how to deal with deaf parents."

7    *Incredibly MP, quoted this letter in her report (the one she could not defend in*

8    *open court) as evidence that I do need services, even though it clearly says there*

9    *are no services available for me for being deaf, from County, at all, nothing that*

10   *would help*.  Again incredulously, and this is in the December 3, 2008 transcript,

11   judge's conclusion is that I will not accept services, not that there are no services

12   for me to accept, going to great lengths not only to re-write the Petition to

13   "conform to evidence," an egregious violation of due process all by itself, but to

14   both override my own doctor and the County's own doctor by diagnosing me

15   himself from the bench!  Then if that was not enough, he went on to diagnose my

16   son with ADHD, even though the DOCTOR (Dr. Marcie Zinn) says in her report

17   he has never had ADHD.  Not only that, at that last hearing, assistant DA Robin

18   Leftwich testified that my son is "a delightful young man with no problems in

19   school."   (see Transcript from December 3, Exhibit 16.)  This is without any

20   County services, without any County testing.  They put him in a public school and

21   that's it.  "Delightful young man."  When I testified that nobody had ever asked for

22   help in my family, I never asked for CPS "help" at all, judge balked and said I was

23   full of baloney.  At the time, my son was hitting me, hard.  Not often, but it needed

24   to stop.  I asked LAPD to talk to him, period.  Therapy I cannot hear is not an

25   option.  I wanted a TRS number to call, something like that, a police number, a

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR**
**COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES**

1    triage number, in case he did it again, period. That's not a service; it's a contact

2    number for someone to come talk to HIM. In Mill Creek, PD did just fine with this

3    task, did not consider it a special "service" at all, just part of the normal job they do

4    with teens.

5  81.    • December 2008. Defendant CPS has its case closed for it by Commissioner

6    Trendacosta for "lack of evidence." On December 3, 2008, there is a hearing at

7    Edelman. Trendacosta avoids CART, holding private court in chambers with all

8    counsel. I am refused the right to examine MP, who wrote the main evidentiary

9    report that judge relied on. MP has not shown up, again. My appointed lawyer

10   (one of FIVE appointed lawyers from LA County) says to me in the hallway, "this

11   case should never have been filed." "So why was it?" I asked her, meeting her

12   eyes with an expectant gaze....She shrugged. "The Assistant DA told the judge it

13   was because the police were involved". I am quite sure that if we call them as

14   witnesses now, they will say they were called directly by CPS to deliver him to

15   CPS, and had "court" not been in chambers, I could have objected, called my son

16   to impeach this "testimony" and be done with it.   No due process at all,

17   Constitution thrown out the window in the name of expediency. There is a limit to

18   how many corners can be cut off the Constitution until it becomes something like

19   origami.

20  82.   Before leaving LA, I file civil rights claims with the County (3 claims filed, one for

21   each agency), and also with the State, same three agencies. DFEH calls me not

22   once but TWICE on TRS, then incredulously sends a letter a year later saying they

23   can't locate a telephone listing for me! All the old TRS numbers work, all are

24   answered by a live operator, and regardless of which number is called or how old it

25   is ALL the messages from TRS go to the same UNCHANGED email,

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR
COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES**

1   abby@parentadvocate.org, unchanged since 2008.  **DFEH has the email**, they

2   send me a few emails in February 2010, but for some reason have a computer send

3   out 2 of 3 right to sue letters, which are reproduced in Exhibits 8 and 9.  The right

4   to sue LAPD was never sent at all.  DFEH computer sends the important right to

5   sue letter to PICKFORD Street in Los Angeles, even though they have a 2009

6   complaint from me stating I lived in San Bernardino, complained to them about

7   noise, then moved back to Riverside and emailed them about the complaint

8   constantly!  I did not receive any right to sue letters at all from DFEH until

9   October 2011, along with Exhibit 10.  What I did receive after filing six complaints

10  with local and State of California agencies about the same incidents reported here,

11  is a royal runaround concluding with, "we don't know how to communicate with

12  you," and that letter is marked Exhibit 11.

13  83.    • January 2009, I moved out of Los Angeles County to Riverside, California.  I

14  re-enrolled my son in same K12 program, no request is made of me to sign any

15  parent revocation form, attend any IEP.  My son is enrolled, works at grade level

16  without services.   My son makes steady progress, we live quietly and nobody

17  bothers us other than police who want to "help" after roommates call them to

18  complain about "yelling."  This is also the month that new amendments to the

19  IDEA allow parents to revoke consent for SPED services parents do not want.

20  Note language there, states…"[schools] *May not use the procedures in subpart E*

21  *of this part (including the mediation procedures under 34 CFR Section 300.506*

22  *or the due process procedures under 34 CFR sections 300.507 through 300.516)*

23  *in order to obtain agreement or a ruling that the services may be provided to the*

24  *child." Which should extend to false police and false CPS reports!*

25  84.    There is still no standard form or procedure for this to this day.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR
COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES**

85. June 2009, I received a fully favorable SSA award, retroactive to 2006; qualifying condition for permanent disability is "severe hearing impairment." Legally this is proof I was deaf when they were talking at me in 2008. That award is attached hereto, Exhibit 12.

86. SSA sent another letter in 2011, it says I am still disabled. That is attached hereto as Exhibit 14.

87. • August 2010, My son and I move out of California to Washington State, my son enrolls in the local "bricks and mortar" public school, to wit, Henry M. Jackson, in 10th grade, it becomes apparent by December 2010 he's missing algebra 2 class that Defendant CPS recklessly removed him from, fails math for first time.

88. • January 2011, I try to re-enroll my son back in K12, they reject my parent revocation because there is no form in the public student file. K12 has no form either, but they require a form. My son continues at the residential district schools, gets mostly Fs, but no serious discipline problems at school, teachers like him, nobody complains or refers him for special education. The general consensus after one year in Washington State is that my son needs to apply himself to his work with more discipline.

89. • August 2011, My son move from Washington State to Oregon, where we buy a house, he enrolls again in the local "bricks and mortar" public school, to wit, Aloha High, now has decent grades (no Fs) but math again a problem and he is required to repeat 10th grade due to not having "enough credits" for 11th grade. He is still attending at the age-appropriate grade level, at age 16. No SPED have been used or accepted since I revoked consent in 2006. The school likes him. I do not use any public services other than TRS. There are no SPED services being used and no incidents reported for close to six years now.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES**

90. I have standing to sue on my behalf as well as for damages to my son's education, for breach of contract (see Exhibit 15), to wit, Defendant County breached the LANGUAGE contract entered into July 10, 2008 and breached it every single time it spoke to me, under duress, ("if you don't talk we won't give your child back.") CPS abused me all over again every single time it called me on a telephone, yelled at me, forced itself on me, harassed me, defamed me, messed up my son's education, confused his loyalties, then finally on December 3, 2008 told me privately it was a big misunderstanding should never have been filed, while the Court still found me to be neglectful of treating non-existing ADHD, which was never in any event a "compelling government interest," let alone an "emergency" requiring anybody's outside "help." There was no serious injury, there was no physical injury caused by me, there was no damage in 2008 to my son's education, the damage became evident after 2008, because County interfered with math. When my son had to rely on skills he was supposed to learn in K12's algebra class in 2008, later on, he did not have them, and he began to fail math, then lost interest in school for the rest of that year, since math had been his second best subject after English, in 2008.

91. Campos' letter actually says clearly that any "stress" experienced was "caused" by a "custody battle." The only custody battle for my son was with LA County. Campos, a LA County DOCTOR, clearly said it in writing: the county caused my stress. Yet MP buried this letter too, and I was not allowed to read it aloud on December 3, 2008 because judge held private court. When they came out of chambers, they spoke too fast, would not pause and my lawyer would not listen to me at all. All personal feelings aside, this is dangerously bad case law, it is dangerous legal precedent.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR**
**COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES**

92.   The breach by Defendants CPS, Defendant County to use TRS and CART has caused personal injury to me and to my son, directly and proximately caused by defendants and each of them, as Defendants' unlawful conduct interferes with my right to have full and equal access to society, as stated above.

93.   K12 allowed me to closely monitor what my hearing son does in school. Without WRITTEN COMMUNICATION I lack that ability.  K12 knew that I needed the online school as much for myself as an ADA accommodation as my son needed it for flexible scheduling and portability.  In denying him this right in January 2011, they denied ADA rights to me and denied continuity and predictability in education to their own student, claiming that K12 in Washington is not the same as K12 in California, when it's the same DELAWARE corporation, same website, same curricula, same online school, all is the same.  K12 then after four consecutive YEARS of no problems in school, suddenly decided to force more services on my son, insisting that if there is no parent revocation form in the student file that he needs to be evaluated (2011 email from K12 counsel in Seattle to that effect is available).  By so doing, K12 has circumvented IDEA, and violated federal law, causing educational damages.  See for example, California Department of Education letter posted on their website entitled at the top under the date "Parent's Right to Revoke Consent."[54]  K12 got my son used to the school then dumped him, in violation of Title 34, Code of Federal Regulations, Part 300, (34 CFR), et. seq.  My revocation had always been in writing, I never spoke to K12 on a telephone, not ever.  Moreover, they had verified the revocation was in a CONFIDENTIAL writing in 2007.  K12 also had my TRS number in January

---

[54] **"May not use the procedures in subpart E of this part** (including the mediation procedures under 34 CFR Section 300.506 or the due process procedures under 34 CFR sections 300.507 through 300.516) **in order to obtain agreement or a ruling that the services may be provided to the child"** Posted at http://www.cde.ca.gov/sp/se/lr/om010609.asp

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES**

2011, but refused to use it, and instead falsely claimed it was "blocked" by the FTC, with no proof at all. It's highly unlikely the FTC would block a TRS number, there is no sound intrusion. If I do not want incoming calls (extremely rare in the first place since TRS numbers are not published, I just do not open the application while I am working).   K12 provided false and misleading testimony in Washington, I certainly hope they do not do the same in California.  It was K12's job to take care of any missing "parent revocation paperwork" in 2007, not 2011. Their failure to put a memo in the file that they had verified my son was not going to get more SPED because I had revoked caused the same school in 2011 to reject him; this is not a kid who needs more rejection.  It caused harm.

94.   Missing paperwork in the student file almost may have been a major cause of the 2008 Petition being filed, LA County Asst. DA Leftwich told Commissioner Trendacosta my son was "truant for two years," not only a false statement, a highly prejudicial statement that was refuted by exculpatory evidence prior to the hearing, the State of California Dept. of Education, Charter School Division had already confirmed the child had been enrolled for at least 16 months at the time she made this false statement under penalty of perjury.

95.   The other defendants and each of them, in failing to use existing free TRS services to communicate with me in 2008 about my son's education and other needs on an equal access basis to its hearing residents, citizens and parents has caused harm to me on the basis of my disability.  Attorney Victoria Doherty told me on December 3, 2008, "Your case should never have been filed." Why was it, then, if not only because I was then and am now deaf?

96.   This disparate treatment, mistreatment and isolation stigmatizes me and causes me unnecessary frustration, and at times unnecessary physical pain. As a result, I am

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR
COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES**

forced to spend additional funds elsewhere just to be able to participate in society as an equal member, for computers, printers, lawsuits, and more time than is required of any other similarly situated hearing individual, which is the epitome of disparate treatment. Here it is caused by government entities, and is ongoing until this court enjoins these parties from refusing to use TRS and other free services that produce WRITTEN COMMUNICATION. Spending six months on a case that "should never have been filed" is a waste of taxpayers' money, including state income tax money I myself paid for over 30 years to the State of California. Furthermore, the services defendants attempted to force on us were of absolutely no beneficial use at all, we did not want them, the expert doctors (they were all specialists, not primary care) said we could not benefit from them and it certainly was no emergency to present us with useless services, while holding an only child as a virtual hostage in a series of four secret placements, one outside of LA County. The end result of Defendants' "help" has been educational and emotional damage to the child they purported to help three years ago, which he is now struggling to overcome, he is behind a year in school due to Defendants' "help."

97.   K12 is a multimillion dollar FOR PROFIT EDUCATIONAL corporation and they should be held to the same standards along with the broadcast television companies, Netflix or banks when they're running PUBLIC SCHOOLS. The lack use of TRS is a slap in the deaf communities' face, particularly in the face of deaf parents.

98.   Defendants' unlawful conduct interferes with my rights to "full and equal enjoyment" of the goods, services, facilities, and privileges it provides others.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES**

99.   One of its purposes of this lawsuit is to reduce communication barriers and to ensure that citizens and deaf parents in particular have equal access to civic and social life.

100.  In sum, there are several ways in which the inaccessibility of defendants' services and each of them harms deaf and hard of hearing individuals, I was denied full and equal access to the online public schools and to the same communication possibilities afforded to hearing parents. K12 allows parents in transition provide a fully legally, mobile K-12 education that can be accessed immediately by student and by parent, which allows parents in housing transitions to provide for their kids without taking them out of school. "Public School" can be attended from a public library or an internet café, for example.  As services such as Netflix.com, Amazon.com, and FaceBook pages slowly replace radio and television, K12 slowly replaces some bricks and mortar schools, with online streaming:  live classes taught by credential teachers in grades K-12 for free or for modest enrollment fees.  Online education, from kindergarten through college and graduate school is becoming the norm.

101.  Every act and omission of K12 was duplicated by each and every defendant herein, for CPS it was duplicated every week the dependency action dragged on without any justification or objective evidence, for at least 22 weeks.

102.  Because the Edelman proceedings are "sealed," there is still no federal ruling on these issues of how to treat deaf parents that defendants can refer to for guidance, particularly when deaf parent revokes consent for SPED.

103.  The Thurston County proceeding is an administrative appeal, no discovery is allowed, no jury is allowed and I am already having difficulty getting Thurston

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR
COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES**

1   County to follow customary and usual ADA accommodation procedures, mostly in

2   relation to TRS relay etiquette, fast talking, interruptions, being the most common.

3   104.   While Ovitsky v. K12 in Thurston County, Washington may lead to more clarity

4   for all parents who wish to revoke consent for SPED in Washington State, we still

5   need a *federal parent revocation ruling*, the law states now that parent revocation

6   only needs to be *in writing*, it does not state it must be accepted, received or

7   approved by anyone or anything.

8   105.   I revoked in writing to the residential district last to supply a service, to wit, Contra

9   Costa County, marked "confidential."  Whose responsibility is it to notify the next

10   school district in writing that parent has revoked, when parent is deaf and all

11   communication is in writing? If K12 is the next school, then why did they not print

12   my email stating "I revoke" and put it in file? If the message was received by TRS,

13   why did they not put their own memo in the student file, stating, "this parent

14   revoked consent for SPED?" Because there is no such rule, yet if school fails to do

15   this, parent is held responsible and child is punished.  If they happen to live in Los

16   Angeles, parent is punished as well.

17   106.   Parents do not have access to school files, schools do, put this burden back on the

18   schools, please, and do not allow them to use their own administrative

19   incompetence to withhold education from deserving and able students, who have

20   clearly demonstrated ability.

21   107.   The ADA was intended to remove barriers and bring people with disabilities into

22   the mainstream. The COMPLETE LACK OF COOPREATIVE USE of TRS, by

23   defendants and each of them, their inability or unwillingness to use a free

24   government service that has been around for over 40 years, intrudes on this ability

25   in a way that increases the sense of isolation and stigma that the ADA was

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR
COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES**

1    intended to eliminate.   Moreover, based on facts pled herein, it's obviously

2    ongoing and I have no recourse unless a federal court issues an injunction to hang-

3    ups, fast talking and interruptions that violate current TRS provider and FCC rules.

4    108.   CPS breached an explicit written contract saying it would use a deaf service as a

5    primary language.   CPS's failure to do so directly and proximately caused

6    educational damages, stress, physical pain, suffering, and financial loss.

7    109.   LAPD had no right to take my son to CPS without a warrant; in violation of due

8    process.   Had they used the deaf service in the first place, there would not have

9    been any "misunderstanding" as they called it (there is a saved transcript with

10   LAPD saying that.)

11   110.   DMH abused its process, SH came into my private home allegedly to make sure I

12   did not need a mental health service, refused to take my audiology report or even

13   look at it, refused to use TRS, refused to lower her volume and screamed at me, "if

14   you do not enroll your son in a public school and stop home schooling him, I am

15   going to take him and I am going to put him in a foster home."   I immediately

16   asked her to leave my home.   She then put my son in a foster home.   CPS relied on

17   this NURSE report instead of DOCTOR Campos' report (dated about a week

18   later).   ***Campos never said I was unfit.   He did say there was no mental health***

19   ***problem the County could intervene with or provide a service for in any way,***

20   ***shape or form, after examining me for about two hours a week after nurse SH.***

21   **VIOLATION OF TITLE III OF THE AMERICANS WITH DISABILITIES ACT**

22   111.   Paragraphs 1-110 are each re-alleged and incorporated as if fully set forth herein.

23   112.   I am a deaf individual who requires WRITTEN COMMUNICATION (TRS, email,

24   fax, notes, CART captioning, etc.) to have full and equal access to audio and

25   audiovisual content and am, therefore, "individual[s] with a disability" as defined

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR**
**COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES**

1   in 42 U.S.C. § 12102(1)-(2) because I have a hearing impairment that substantially

2   limits one or more of my major life activities, including the major life activity of

3   hearing.  I do not use telephone, television or radios for information.  I have not

4   had a doorbell since I left Northern California.  I do not answer the door for

5   uninvited guests.  I am also, perhaps, contrary to defendants' statistical stereotype,

6   not dumb or mute; I am educated, mature, self-supporting and independent.  I also

7   did not fit the racial stereotypes for this neighborhood, which appeared to cause at

8   least some of the conflicts surrounding what food and what religion fosters should

9   have.

10  113.   I avoid speaking because I cannot understand normal speech without slowdowns,

11  repetitions, pauses and lower volume.  I also have chronic pain, problems sleeping

12  on a schedule, mobility problems, allergies, light sensitivity, asthma, coughing fits,

13  etc., that is, a bunch of physical problems relating to normal aging.  Aside from

14  hyperacusis and auditory processing, the rest of the list is pretty common and

15  nothing was an "emergency" justifying taking a battering ram to my front door

16  without first obtaining a legal warrant.

17  114.   Defendants and each of them operate a place of public accommodation as defined

18  by Title III of the ADA, 42 U.S.C § 12181(7) ("place of exhibition and

19  entertainment," "place of recreation," "sales or rental establishment," and "service

20  establishments").  Defendants and each of them, in violation of 42 U.S.C. §

21  12182(a), failed to make its services accessible to individuals who are deaf or hard

22  of hearing by failing to training to its workers to use TRS services competently.

23  These services have been around for 40 years, defendants' ignorance is absolutely

24  no excuse and this court has never before rewarded ignorance of the law.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR
COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES**

115. Title III of the ADA provides that "places of public accommodation" may not discriminate against people with disabilities. Specifically, it directs that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns…or operates a place of public accommodation."

116. Discrimination under Title III includes the denial of an opportunity for the person who is deaf or hard of hearing to participate in programs or services, or providing a service that is not as effective as what is provided to others. 42 U.S.C. § 12182(b)(1)(A)(i-iii). For me, TRS is more effective than CART, because I can SEE it more easily and I can re-read what was said by scrolling, this helps me customize speed. CART allows no speed adjustment; I still missed 50% of the proceedings at Edelman, because my attorney would not ask the judge to speak SLOWER after I asked directly at each hearing, she told me to "shut up." CART is not helpful if speaker is speaking too fast for the stenographer to type, that's what Commissioner Trendacosta did.

117. Modifying its policies and providing closed captions as auxiliary aids and services to make all government workers familiar with TRS so that they do not hang up, talk too fast, interrupt, and otherwise observe "etiquette" would not fundamentally alter the nature of Defendants' business, nor would it pose an undue burden to any of them.

118. Defendants' conduct constitutes an ongoing and continuous violation of the law. For over three years now, defendants and each of them have failed to take any prompt and equitable steps to remedy any of their discriminatory conduct, often adding insult to injury repeatedly. Unless restrained from doing so, defendants and

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES**

1    each of them will continue to so violate the law. Defendants' conduct has caused

2    and is very likely to continue to cause egregious injuries to other deaf parents who

3    are fit but not allowed to participate in their own defense.  Because of ongoing

4    CPS   ignorance,   loving   families   will   be   broken   up   due   to   ongoing

5    miscommunication that can easily be prevented with some training.

6  119.   This complaint is captioned with Does, because I expect there are many more like

7    me out there afraid or unable to take the step of writing and filing a complaint such

8    as this one.  Deaf parents have no adequate remedy at law for the kinds of injuries

9    my son and I suffered and will continue to suffer. Thus, deaf parents are entitled to

10    injunctive relief.

11  120.   Finally, this complaint, now 48 pages plus 15 exhibits, was originally presented to

12    the Clerk of the Court at the filing pen, on Friday, December 2, 2011 before

13    closing time, via messenger.  The messenger sent an email to me on that day after

14    4 pm stating clerk refused to file this complaint only because the first page stated

15    "and as guardian ad litem for…etc." I rewrote the complaint to comply with

16    Clerk's interpretation of the law, under protest, and strongly advise my son to seek

17    counsel and file his own separate lawsuit against defendants herein and each of

18    them for HIS damages.

19  121.   I spent as much time over the past three years, despite many housing challenges,

20    trying to communicate directly with defendants and each of them as indicated by

21    the exhibits attached hereto.

22  122.   All statements made herein are true and correct upon information and belief and I

23    can and do verify that all statements can be independently corroborated with

24    evidence already in existing case files and with witnesses already on previous

25    witness lists all mentioned herein, including Bramachari Lee, the monk whose care

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR**
**COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES**

1  my son was in 2008 when he received the sunburn on his face that LAPD mistook

2  for "parental abuse."

3  <u>PRAYER FOR RELIEF</u>

4  WHEREFORE, Plaintiff respectfully prays that this Court:

5  1. Declare that Defendant's failure to competently use TRS and provide training

6  for all government workers to use TRS violates Title III and Title IV of the Americans

7  with Disabilities Act;

8  2. Issue an injunction requiring Defendants to provide training as needed so that all

9  its workers and staff can competently use TRS services;

10  Order defendants and each of them *to adopt a policy where all incoming relay*

11  *calls from people who are deaf or hard of hearing must be accepted in same extent that*

12  *they accept telephone calls from hearing customers.[55]"* (emphasis added).

13  Order all California CPS, police, fire, EMT, mental health, school admin, public

14  school teachers and court personnel to do the same.

15  3. Award costs and reasonable attorneys' fees; and

16  4. Award compensatory damages to be determined from breach of contract and

17  any other intentional or negligent acts of defendants and each of them;

18  5. Come up with a standard written procedure including a form for parents to

19  revoke consent for SPED;

20  6. Award punitive damages to wake these defendants up;

21  7. Award such other and further relief as the Court deems just and proper.

22

23  Dated:  December 5, 2011

Respectfully submitted,

24

Abby J. Ovitsky
Plaintiff In Pro Se

---

[55] http://www.nad.org/news/2011/6/nad-sues-bbt-bank-denying-relay-calls

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, FOR**
**COMPENSATORY (BREACH OF CONTRACT) AND PUNITIVE DAMAGES**

## EXHIBIT LIST

1. IC3 (redacted minor name)
2. 200C re Central Court
3. 2000C re OAH/OSPI
4. 2000C re CPS has Paton/audiology (my medical report)
5. 2000C re DFEH
6. 2000C re K12
7. TRS saved call transcript 12/01/11
8. DFEH notice of case closure re CPS on 10.1.09 first received 10.17.11
9. DFEH notice of case closure re DMH on 10.1.09 first received 10.17.11
10. DFEH correspondence by email & TRS prior to October 2009.
    10-1: 10/17/11 email from DFEH "letter sent by computer," 1 page
    10-2: 8/28/09 email from DFEH to correct (same) email, 1 page
    10-3: 1/2/09 TRS saved call ending 9:38 am from DFEH/LA County re claim, 2pp
    10-4: 12/30/08 TRS saved call ending 13:18 from DFEH/CA County re claim, 11 pp. (redacted minor name)
11. letter from DFEH investigator
12. SSA fully favorable
13. Campos
14. SSA July 2011 "still disabled"
15. LA County Primary language form re use of Relay in 2008
16. Transcript from Edelman court proceeding 12.3.08 (redacted) (redacted minor name)
17. CPS TRS call Vivian Marcelino 7.10.08 (redacted minor name)
18. LAPD TRS call 7.10.08 Dye (redacted minor name)
19. LAPD TRS call 7.10.08 Ventura (redacted minor name)
20. TRS with UR Relay/NextTalk re FCC procedures

**EXHIBIT 1**



REDACTED NAME
OF MINOR
**COMPLAINT REFERRAL FORM**

## Complaint ID: I1112011235054431

*The following information was provided by the victim and may be forwarded to the appropriate law enforcement or regulatory agencies.*

Date:                          12/01/2011 12:35:05

**Victim Information**

Name:                          Abby~~~~~~~~~~~~~Jo Ovitsky
Business Name:
Age:                           50 - 59
Gender:                        F
Address:                       6900 SW 195th Avenue 133
City:                          Beaverton
Do you live within the city limits?:   Yes
County:
State:                         Oregon
Country:                       United States
Zip Code/Route:                97007
Phone number:                  5032070208
Email Address:                 abby@parentadvocate.org

Name of your local police or sheriff's office:
Beaverton

Is the complaint you are filing related to the Internet or an online service?     No

Do you have pertinent documents in paper form?     No



EX 1

**Information about the Individual/Business that victimized you**

| | |
|---|---|
| Business Name: | Los Angeles Children and Family Services |
| Name: | Sandra unknown Hickey |
| Gender: | F |
| Address: | 5757 Wilshire Blvd |
| | DCFS |
| | 200 |
| City: | Los Angeles |
| State: | California |
| Country: | United States |
| Zip Code/Route: | 90036 |
| Phone number: | 3239002222 |
| Email Address: | |

**Other Identifiers**

| | |
|---|---|
| Web Site: | http://dcfs.co.la.ca.us/contactus/locations.html |
| IP Address: | |
| IRC Server: | |
| Chat Room Name: | |
| Usenet Newsgroup: | |
| Other: | |

**Monetary Loss**

If you lost money from the incident you are reporting, please specify the total dollar amount of your loss.
0

Please indicate the means of payment (select all that apply)

- ☐ Cash
- ☐ Cashier's Check
- ☐ Check/Debit Card
- ☐ Credit Card
- ☐ Money Order
- ☐ Wire Transfer
- ☑ Other (Specify)happened some time ago unclear

Did you use a third party online payment service such as PayPal, BidPay, Escrow? No

## Description of the Incident

Describe in your own words how you have been victimized.

BACKGROUND

I AM NOT THE VICTIM, MY SON WAS, I am the birth mother and legal guardian. I filled out the IC3 online complaint form for him as his mom/guardian. I told him I would report this and he encouraged me to do so, I believe he will fully cooperate with any investigation, should you choose to investigate.

I have not had a telephone since 2008, I use TRS only. I used my telephone primarily for talking to people I already knew, because those people knew also about my hearing impairment. I do not wish to have any direct contact with suspect now. I avoided direct contact with all the foster parents and eventually with the social workers because I could not understand what they were saying, due to my disability (hyperacusis and APD .) I do wish to learn the truth.

My name is Abby Jo Ovitsky. I am 53 years old now. I live in Beaverton, Oregon. During the time of the alleged events reported herein, I lived at 4567 Pickford Street Apartment 8, Los Angeles, CA 90019. We moved to that location from N. California due to housing. We moved from that location also due to housing and harassment from CPS. We did find housing a few months later in Riverside, were there 18 months, moved to WA State for about a year (for education opportunity and due to local anti-Semitism in Riverside, Mill Creek was not overtly anti-Semitic but not comfortable either) and then here to Beaverton in August this year, again for housing and education opportunity. I am satisfied so far in Beaverton, and there is much better communication here than there was in Los Angeles (same has been true generally of Washington State also, law enforcement takes time, uses email, etc. unlike anywhere in California weve lived .)

These events complained about occurred July 10, 2008-December 3, 2008. We came to LA in March 2007.

FACTS AS TOLD TO ME BY ▚▚▚▚▚▚▚▚▚▚▚▚▚

My son reports that suspect drove him in her car, across state line to Nevada, and spent night with him in casino hotel in Las Vegas, I cannot be sure which neither can he, something with Circus theme and/or name, there is more than one casino in Stateline, it was near border/freeway.

I would like you to interview the suspect and my son. I now do believe this is true because 3 years ago come Thanksgiving, social worker from CPS contacted me and asked me for my permission as parent (parental rights were never removed, it was only an investigation, based on bad tip ) to allow my son to go to Las Vegas with suspect. I immediately said NO. My child returned a few days later because of no existing placement for him, this is what I had more or less expected from the beginning. A week later my case was closed.

I honestly do not remember when my son first told me this story, it was not immediately after he was released back to me, it was some months later, after we were settled, I believe not before late 2009 or 2010. It sounded too incredible to believe and at first I did not believe it, but he repeated it quite a few times without changing any details.

The 2008 investigation began with a loud argument we were having, he had hit me with a broomstick, I did report that to LAPD (he's done similar things since then also reported, breaking doors recently, not hurting me, and for past six months has not done more than sass really, he's a good kid, doing well in public school, I am on SSDI, alls well with us at home but this uninvestigated story about suspect really bugs me.)

When LAPD first came to my front door in 2008 to investigate, there was no sign on the door saying I am deaf or asking them to use TRS, so they yelled and tried to break the door down. We spent all afternoon sorting out the misunderstandings on TRS after LAPD had used a battering ram to break down my front door while my son WATCHED them do it. I have only the one child. No arrests were made at the time, there was nothing illegal going on inside. My son has also repeated this:  that LAPD had satisfied themselves on July 10, 2008 that there was no abuse and had put my son in a squad car and were on their way back to my apartment when CPS called the squad car and told them to turn the car around and take him to CPS to be detained, all without warrants, neither of us to this day have any criminal record, I am a retired legal secretary myself.

I can swear to the above under penalty of perjury in any court, to be true and correct to the best of my

ability to report to you, and I did ask him to repeat this quite a few times due to my hearing impairment. If he will repeat also to you and also sign a sworn statement, you may have a case. He says he got along fine with suspect and he does believe she will be truthful if confronted. Shes not dangerous, no drugs, no guns as far as I know and as far as I know shes still working for CPS.1

My other question is who has been funding suspects trips to Vegas and how many other teenage boys has she taken to spend &quot;at least one night in a hotel room&quot; with? He says it was at least one night, does not recall details, thinks there were two beds?! He was 13 at the time. I am not a religious fanatic. While LA may have disagreed, I do draw the line here at moral decency. He gets angry if I persist questioning him, so maybe something did happen? Seems like kidnapping and sex abuse to me from where I sit now. There was never any sex abuse at home, not ever, and no physical abuse, spanking and occasional wrestling exaggerated greatly, if anything, and hands to self ever since about 2007. There was a facial sunburn at time also greatly exaggerated. You can review police reports, I have most of them. My son does say the first incident of two reported in 2008 involves something that sounds like entrapment, but you would have to ask him directly about that, again, I am not sure what to make of it. In February 2008 there was a very similar argument, but no sunburn. He had pushed me, I had tried to block the front door, he pushed me, there was a struggle and he won, went for a walk in neighborhood during day, ended up at local grocery store. Our apartment on Pickford was about 3 blocks from Wilshire LAPD, a large station house. I think he said he went to Ralphs, the nearest large grocery. He told me he purchased a soda pop and a bag of chips and was sitting on something eating and drinking and chilling out when LAPD approached him and told him to go into the station house and report me, and he cooperated under duress. He also reports to me and after watching films on topic (not many there are not many existing) between 2008-2010 or so (not recently, I am not coercing or feeding him lines at all here, this is completely separate, you would have to see our house to see how separate) that he was coerced by CPS and by LAPD on the two reported occasions to make reports. He said to me, they do all the talking. I can figure out which films I showed him and when from looking at Netflix.com records. Not any time recently. He has had at least a year to clear his head without any daily conversation on this topic, it rarely comes up now unless he brings it up. I encourage him to write about it. He has great difficulty now in English class when asked to write about family. He has decent grades now in all of his other classes and he has great writing skills, assessed separately and repeatedly. He has taken all State assessments since 8th grade and done quite well. He goes to and from school independently, does homework, is law abiding and Aloha High likes him.

The ADHD diagnosed by Kaiser in 2001 or so was extremely controversial and disputed, I withdrew treatment in 2006 only after getting two expert doctors reports saying he does not have ADHD and in fact without treatment for six years he's doing fine. I think had CPS used TRS to communicate instead of trying to break door down none of this would have happened. There do not seem to be any permanent damages. Would you be willing now to go ask her if she did it? CPS pays foster mothers about $900/month and must have some paperwork re her expenses. My son said she was driving a new Prius. She worked at Kaiser at the time, said she was a nurse, I did not find any nursing license under name &quot;Hickey&quot; in California anywhere. It may still be going on.

My son lives with me and HE is the victim, he encouraged me to report it, I think he's curious about what suspect will say after 3 years. Suspect at time lived in Los Angeles County, and her address might be in old records, you are welcome to come dig through my old records, there are a lot of them. It may be easier to just ask CPS for her address, my best recollection is Sunland, California, walking distance to: Mount Gleason Gifted - Ha Mag School, 10965 Mount Gleason Ave, Sunland, CA 91040

He says she would drive him there mornings on way to work and he would walk to library after school, where she would pick him up afternoons or evenings. She was also a single mom at time (as am I). She did not cook, she took him to restaurants, which is what I also did when I worked.

Please email (abby@parentadvocate.org) me fax me (866276.7691) or call on TRS (5032070208) but calls on TRS have to be scheduled, or you will get a TRS operator (Communications Assistant/CA) and if you don't wait and follow instructions only message I get is &quot;#&quot; &quot;hung up&quot; so email is better for most people, I am more than willing to call you back at prescheduled time!

This has come up again because of 2000C complaints re TRS I have filed recently, LA County signed a

formal written contract with me in 2008 to use TRS, then they refused to do so, in course of preparing paperwork I see that there was no formal complaint to FBI re suspect, want to make sure you have some opportunity to investigate, though if it's too late, I do completely understand. There has never been any issue of safety or any real emergency ever at my house, there have been loud arguments because I am deaf, I cannot control (or hear) my volume, so now we use mostly written communication. I can talk, I am not mute at all. How much I can &quot;hear&quot; depends on whether or not speaker can slow down, lower volume, pause, repeat, etc., it's sound processing disorder, similar to stroke victim.

I need to make sure you understand my son was the one victimized, not me, and allegedly by this former foster mother who works for CPS, that's the contact info above for them. I just filed the 2000C about the agency not using deaf services in 2008. I've tried many times since my son first told me this story, since I do NOT KNOW if it is true to report, but not to FBI, nobody has taken it seriously evidently. You have my permission to question him at his current public school, which is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮n. ▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮Oregon, Washington▮▮▮▮▮▮

We've not been here in Beaverton long, since August, the neighbors only know that I am deaf. I normally do all of my socializing with a keyboard. If LAPD won't do anything then perhaps you can/will. I seem to recall reporting it to LAPD because after my CPS case was over I had a complaint about LAPD not using TRS and there was an exchange of emails, I can look for those to see if I asked them to check it out. I seem to recall emailing or calling or attempting to call CPS on TRS, but they tend to hang up on TRS. I know I did report this to several private attorneys, would be by email and may have those emails and would have been recently. The thing that most concerns me is IF it is true, how long has she been doing it, how many boys has she taken to casinos? Exactly what went on in Vegas?! And on whos dollar? My taxpayer dollar?!

While I am still not thrilled with CPS, there is no grudge match here, this is about suspect, not about CPS, and if it is true, CPS probably has no idea she did it. If it is true, please tell them!
Posted this day at https://complaint.ic3.gov/default.aspx at 12/1/2011 8:57:46 AM

Please indicate any medium used by the individual/business in the course of the incident.

- ☐ Bulletin board
- ☐ Chat room
- ☐ Email
- ☐ Fax
- ☑ In person
- ☐ Internet messaging
- ☐ Mail
- ☐ Newsgroup
- ☐ Telephone
- ☐ Web site
- ☐ Wire
- ☐ Other

Please indicate the initial means of contact with the individual/business that victimized you.
Other

Was this initial means of contact unsolicited/uninvited?
Yes

What was your relationship with the individual/business you are complaining about prior to the incident you are reporting?
no prior relationship

Did you conduct any research on the individual/business prior to the incident?
No

How much time has passed since you determined you were victimized?
6 months or more

**Contact Information**

Are there witnesses or other victims to this crime?

My son, ~~████████████~~("██") lives with me, attends ~~████~~h in Beaverton.

I have tried to chat with law enforcement on FB about this, do not know if any of those are saved, I tend to clear screen each time I am done, this would have been 2010-2011.

I stopped discussing much with my son after he walked out of film last year.

approx. dates are October 2008-November 2008

If you think I am making this up in order to strengthen my case against LA, dont investigate it, but if you ignore it and she is sexually abusing minors in LA now, in FBI choosing not to investigate it does those other kids a disservice. I cant use it in court against the County anyway if its not true, and if you investigate and find it untrue, court will ignore the report, thats fine, the main complaint is about language not about unauthorized trips to Vegas.

I can swear he told me this many times, and he has for the past two years or so no reason to tell me what I want to hear.

Have you reported this crime to any law enforcement or government agencies?

- ☐ Better Business Bureau
- ☐ Consumer protection agency
- ☑ Individual/business that victimized you
- ☑ Police/other law enforcement
- ☑ Private attorney

Provide the specific name of each organization, contact name, contact phone number, email address, date reported, and report number (if known).

Los Angeles County Children and Family Services
West LA (SPA5)

5757 Wilshire Blvd., Suite 200, Los Angeles, CA 90036
Helen Maxwell, Division Chief (323) 900-2200
Reception (323) 900-2222

**Digital Signature**

By digitally signing this document, I affirm that the information I provided is true and accurate to the best of my knowledge. I have read the IC3's Privacy Policy, and understand that this information may be provided to law enforcement and regulatory agencies. If available, I will provide additional documentation not included in this complaint, such as email correspondence, payment receipts, or electronic logs, upon request to the best of my ability. I authorize the dissemination of the complaint, or information in the complaint, to appropriate federal, state, local, tribal or international Law Enforcement Agencies (LEAs) for purposes of investigating the complaint.

Abby Jo Ovitsky

**Supplemental Information**

------------------------------------------------ 12/01/2011 12:41:23 ------------------------------------------------

I can't print it out! it's cutting off at bottom not displaying can you email me a copy so i can tell federal court i did report to law enforcement? thanks!

Exhibit 2

(printing transcript
now)

(nobody is interrupting anybody)

(fine tha
n she can read about it when ADA officer calls her
from Washignton DC)

(wanda marshall is not listed as ADA
officer)

ica
nnot use postal mail due otoxxx to other
access issues)

(do not read the
se parenthetica's to her )

Ms. Marshall, who is Lorenzo Davis, we are not done yet,
please do not hang up.

I cannot use USPS because: there is no outgoing pickup in
my trailer park for USPS. the closest USPS office is several
miles away. I cannot tolerate noise there, due to my bone
fidi

thanks, i'll use this to fle now.

bye ga

to sk

interrupt but she can't, and said she didn't want to listen to
the rest

b/c she already explained the situation)

um the only thing I can tell you is that even the attorneys are
not allowed to efile initiating documents they are only
allowed to email subsequent documents so

even if you was an attorney you could not efile an initiating
complaint, you have to bring it in manually or yewe someone
mail it in or bring it over I'm not asking you t o hire msger to
pay $1000 but you would have to use us postage to mail
initiating complaint so we can assign case # and judge even
attorneys follow same procedures only able to efile
subsequent documents

that have case # can only efile subsequent case we are not
that far advanced yet for efile so if youw ant to report to
wash dc I'm only doing what the court

has in place the policy of the court we do efile but only for
subsequent documents but only for

attorneys we only efile for subsequent comlaints so have a
great day. byebye ga

(hung up)

THANK YOU FOR USING RELAY CA 1423F BYE SKSK

my deadline is this week, this is
causing me to be discriminated against in fill
ng the complaint by your court ge

the operator has told you twice to slow down, please
slow down ga

(sorry for interrupting)

I apologize wanda mares...marshall...

I need to file by ECF now or i will be prejudiced, my deadline
is December 3, 2011, if I am not allowed equal access due
to ADA mismanagement at your FEDERAL COURTHOUSE
that prevents me from using a service available to all
attorneys, then i am acting as my own attorney here, not
only that, i completed ECF training when i was in california
before moving to Oregon.

this is the only practical way to file and you just told me you
have not gotten it together to be fair to all because the court
is "big" and you're taking "baby steps."

if I have to pay $1000 to file it i will but i will also now file
today a Title II and Title IV complaint against the courthouse
administration for unequal access and discrimination against
pro se plaintiffs who act as their own layers, an apology is
not sufficient, it's nice, but it does not cut it.

i need equal access NOW, not in 3 weeks because my
statute runs this WEEK and i could not get any lawyer to
assist me because I live in OREGON and I am deaf do not
sign and cannot use VRS, I ONLY use written
communication, IRS, CART, email, faxes, and anything
where i can see the words.

i am on social security disability.

there is a federal ruling verifying that I am deaf from 2006,
it's retroactive from 2009.

I can prove i need this ECF for equal access and that if you
admit it's not aviable due to mismanagement on the
administrative level, you've just admitted that I don't have
access to it NOW because of some administrative reason.

next week is too late for this case. my damages from the
COURT will start a tab the moment I pay the first fee, and I
estimate it will be about $1000 maybe a bit less to hire a
process server to walk it over to you with the fee waiver
application becuase and only because "ECF" is not yet
available for pro se litigents."

before i give you go ahead i am printing this much out as an
attachment to the ADA claim I will fax over today to
Washington DC to report this continuous ongoing disparate
treatment of deaf pro se litigants in Los Angeles. do you
have any questions before I do that?

ga

time
and and weill understand that he has to make a filing before
Friday (talking too fast, asked to slow down) you're gonna
have to hold on (flat tone, silent

hold) (apr here I keep having to interrupt her and ask to stop
b/c I can't type
when
you do so her msg is very spotty
and
i'm not getting everything)  (ANS) (F) okay i'm sorry i'm sorry
um...

so to

(interrupted while reading to complain that you can

that address failure to use TRS and failure to put closed captions on time. I believe NAD or national association for deaf filed both lawsuits in federal court recently.

i call to your attention that all TRS is recorded/saved by me in writing in a form that i cannot edit or change.

today's call made to you to find out how i can file my suit against LA County for these violations using ECF, because that is convenient it is visual and it allows me to track the case filings easily. Clerk says not for pro se. I say this is de facto disparate treatment and unequal access to federal courts, and it constitutes a Title II violation and may constitute a Title IV violation of ADA law because your clerks (two documented so far) have no idea what TRS is.

so far this call has taken nearly half an hour away from my writing and research time and I am not closer to knowing how to file by ECF, i must have equal access or I will file today and fax today or early tomorrow a new federal IV complaint and new federal II complaint to Washington DC to the ADA, personally before I file this complaint against LA county and state of California for also refusing to use TRS relay.

my deadline is friday, there is no practical or reasonable way for me to fly from Oregon to California to file it at the window in person. there is no reasonable way for me to hire someone to do it, will cost about $800 to $1000. I will be filing a fee waiver request.

now, i will wait for your go ahead, please ID yourself before responding. I will not interrupt. please do not interrupt me and please speak slowly or operator cannot transcribe.

i save all my conversations.

there is no sound recording

i have used saved conversation transcripts in court as evidence, they are accepted on a case by case basis depending on objection of defendants.

your turn, i'll read what you have to say ga

(4:09 pm)

(asked to repeat greeting) my name wanda marshall pro se for
civil
xxx (asked to slow) we do not accept electronic filing for pro se litigants i mean uh electronic filing for attorneys why that's

why noboxx x
( sorry do not interrupt)

just the general order only allowing attorneys tofile basically this is a very very

(in pro se=totlo
xxx attoyxxatty)

this is a very large court & we started w/ baby steps and we started with attorney

(why not? pro se same as attorney/ey i vhxx hv ha d training)

efilings first and I'm sure maybe by the first of next yr we'll add the pro se litigants to efile i'm

(not soon enough for me)

I understand he is in not in california and cannot be here at a certain

(
sha)

abby ovitsky.                                                                              sys:relayservice@bete7.net

the way i see it you have no right to restrict ECF to non pro se.

please ask your supervisor.

i check email often, my email is nbby@parentadvocate.org

there is no phone number no voicemail and use of TRS is limited to cals that are SCHEDULED in advance with me by email, there is no way for you to leave a message unless you take time to wait for operator to answer and dictate your message this can be quite time consuming.

i am going to hold now at 4 pm for you to go discuss this with your supervisor.

i must use ECF.

ga                                                                                         (put on hold before msg began, was unable to type that.. will
                                                                                           read msg when she returns q ga)
                                                                                           (ANS) (F) hello okay thank you for holding unfortunately
(do that)                                                                                  there is no other way around filing a new action

i need your name and title for the federal ADA complaint i will now have to file because you are unreasonably restricting me.

i must use ECF and I insist you tell me how to use it ga                                   (opr here, I can't read your msg until you
                                                                                           stop
(i will stop when i am done)                                                               typing ) ga

(read please now, not parentheticals)

(then...my damages start now for the case to be filed                                      (reading msg)
AGAINST THE COURT FOR REFUSING EQUAL ACCESS
TO ECF)

(read last?)

                                                                                           (opr here just so you know -0 whey xxx when you type it
                                                                                           scrolls me down so I wasn't able to finish reading your msg,
(i can                                                                                     she interrupted and is
repost it)                                                                                 transferring to the supervisor - if you
                                                                                           could
interruptixxx tell her that interruptions are violation of FCC                             repost that would be great :) ga
rules.

i don't know how far you got, or if she was listening and i
asked for a name and title did she provide that ga

                                                                                           (opr here if you're asking me, I did not get that far. would
                                                                                           you like me to read this to the new individual q ga)
for new individual:

clerk refused to identify herself.

clerk stated what appears to be policy of your FEDERAL
court to RESTRICT ECF access to non pro se litigants.

this is an outrageous policy which prevents pro se litigants
from equal acces.

i call to your attention several new pending federal lawsuits

ebby ovitsky

aya:rainyservice@bnta7.net

| | ty you too and again I apologize for the inconvenience (hung up) |
|---|---|
| (ty) | DIALING (213) 894-3434 PLS HLD... (busy signal) |
| (ty) | redialing.. |
| (time is 3:52 pm) | DIALING (213) 894-3434 PLS H. D... (busy |
| (keep redialing they've very busy there) | signal) |

redialing.. DIALING (213) 894-3434 PLS HLD... ring 1..
(ANS) (I ) intake this is julie (announced relay) no
(EXPLAINING RELAY ...)

(intake clerk at U.S. Federal Courthouse in 2nd largest city
in USA does not know how to use FRS)

good. i am an in pro se litigant for civil. i wish to file a
federal civil case based on federal question. i wish to get a
fee waiver. i see the forms on your site. it says there i can
file it 24/7 by ECF, how do i manage to do that? do i have to
pay for pacer before i file so i can use ECF? is fee waived
on PACER? is PACER required?

yes ga civil intake department ga

so if there is already a link about this on your website, i have
not found it or located it yet.

i intend to file this week and i would like to comply as much
as possible with your local rules so that we do not have to
fuss about the form of it later on.

i also read that if i file it by ECF, the service piece is
automatically taken care of. normally i would have 120 days
to serve, if i file electronically do all defendants get served
immediately? the defendants are city and county of los
angeles and state of california, they all have public counsel
with email. ga

(3.55 pm)

(clearing throat) ...pro se litigants cannot e-file ... a new
action needs to be brought to the intake window ... the
packet is online ga

i reside in portland oregon and there is no reasonable way
for me to appear in california, i am SEVERELY PHYSICALLY
DISABLED, cannot come to the intake window at all, there is
no physical way i can do that. ga

you can mail the documents to united states district court ..
312 north spring street

n
a, i cannot5, xxx no, i cannot it's too late for that.

explain how ECF works, i must use ECF, it appears to be
discrimination and disperate treatment if ECF is available for
all other litigants but NOT FOR PRO SE DISABLED I
REQUIRE IT AS IT IS VISUAL AND I CANNOT APPEAR IN
PERSON THAT WOULD BE VERY EXPENSIVE TO FLY
DOWN OR HIRE A PROCESS SERVER, WILL CHARGE
OVER $100 FOR EACH SERVICE drop...it will cost me over
$800 to file if i do not file with fee waiver.

let me speak to my supervisor

I have had ECF training and can use it. I cannot reasonably
come in person and will be requesting ADA
accommodations from the court for all appearances after it's
filed.

(waiting for go ahead now, time is 3:44 pm)

Francisco Ayala. you have, i need some questions answered about ECF filings ga

I began calling five minutes ago and three clerks hung up.

telling me you don't have time for deaf services is an insult.

I am pro se. How do i file my federal complaint in your court on ECF ga

(!!!)

(all of this is unimportant)

okayMr. Ayala...two hangups then you said to operator you don't have time for this. YOUR number is listed on the federal website as the number for the clerk's office. so if i have reached the wrong number, it's due to your website being wrong.

what please is the correct number for the clerk's office, mr. ayala? ga

(no automated numbers)

(hort)

yes. please, ga?

tyvm mr. ayala, and now you know how to use deaf services a bit better, this is a warning. do it again and i will file a Title II and a Title IV complaint with the ADA in Washington DC, ty for complying better late than never.

i will now call 213 894 3434 ty hv a nice day.  I have spent 10 minutes getting this number b/c number on your website shows YOUR number as clerk's office, if you don't want to get more wrong numbers i humbly suggest you TELL someone the number on the site is  WRONG ga

(after he disconnects, dial 213 894 3434 plz CA...and i will get a new keyboard soon!)

---

ayala I have not insulted anyone.

okay ga

okay before we go any further this is a copy department,i have no information on how to file you know but what i can give you a number with the intake clerk um they can help you or assist you there and if I did hang up on you I I wasn't aware of how the call was.. you know.. going to be .. and I do offer my apologies with all sincerity but this is the copy department and I understand our # for our company is on the website and you know unfortunately that's all we have right now even if we were to have a regular fed court # it would be an automated # so taht probably be a way not to go but again I do apologize for the inconvenience um but to my knowledge ... it should be someone in the intake service window where they file a document um

they can better assist you on how to go

and better file your pro se document ga

well I can't I can I can give you ans utomated # you knn and again.. if .. if .. this person is a deaf person.. you know idk how they would assist her in that matter what I can do I

do have an intake clerk's # maybe that would be able to assist him or her better would that bee key q

ga okay area code # is 213-894-3434 ga

ebby ovitsky

sys:relayservice@beta7.net

H
e
l
o
,
p
l
e
a
s
e
d
i
n
l
2
1
3
.
2
5
3
.
9
4
1
3
.
G
A

Tuesday 11/29/11
, Fed Ct ADA & filing Clerk
Title II / IV.

(clerk answering at 9th Circuit does not know what is TRS)

redial im
immediately ga

(explain he is a federal worker i am calling on a federal deaf service and explain please until he gets it, time now is 3:41 pm on Tuesday 11/29/11)

continue redialing please ga

(calling at 3:42 pm Western Division, U.S. Courthouse, Clerk's Office, Room G-8 about federal filing and Pacer and ECF)

redial and tell them that I will be filing a Title IV complaint TODAY if they continue to hang up on federal TRS please

if you do not have time make time, if you do not comply with FCC rules, I will report you, name please ga

i am a pro se deaf litigant filing in your court, make time and please stop insulting me ga

Please hold for the next available Communication Assistant. NexTalk Powered by CAC

CA 1423F DIALING (213) 253-9413 PLS HLD.. ring 1..
2.. 3.. 4.. (ANS) (M) abc how can I help you (announced relay) uhh what is that {EXPLAINING RELAY...} (interrupted explanation A said no alt right ty have an ice day bye (hung up) WOULD YOU LIKE TO PLACE ANOTHER CALL QQ GA

DIALING (213) 253-9413 PLS HLD.. ring 1..

{clicking sound - answered but line silent) (other party hung up w/out speaking) WOULD YOU LIKE TO PLACE ANOTHER CALL QQ GA

DIALING (213) 253-9413 PLS HLD...

ring 1.. (picked u p & hung up right away.. redialing)

{EXPLAINING RELAY...} {EXPLAINING RELAY...} ok I don't have time for this this is a business {EXPLAINING RELAY...} ok yes ga

francesco

## ATTACHMENT TO 2000C Complaint re LA Federal District Court Unequal Access for Pro Se to ECF and about hang-ups today:

Attached is the referenced saved TRS conversation (unedited/unredacted) captioned in the transcript footer as "Conference Call (11/29/2011 16:21)" conversation this afternoon with the Federal Court, transcript is 7 pp, I will fax tonight to you after scanning. We begin with 2 hangups. Then clerk who does it) did not listen to explanation of TRS, said he did not have "time" to listen to a federal relay operator explain federal relay to him, and he is a federal employee!

Read please what third clerk has to say about access to ECF. I called Rapid Legal (local private process server in Los Angeles I happen to know from my personal experience as professional legal assistant in California for 25 years) after this call ended, the first person at Rapid Legal answered and did not hang up, was courteous and responded by email: cost if I cannot use ECF will be min $750 for filing and service of a complaint against LA for among other things, Title IV violations in 2008.

I have submitted the first four 2000C complaints by fax and one went by Fedex. I just discovered you have an online 2000C, thanks much for that, it's a lot faster to report violations to you with that online form. I will refer you in this and subsequent complaints to those exhibits attached to the first four complaints[1] for answers to questions you will have such as: are you a disabled person as described by federal law, what is the disability? What is the reasonable accommodation requested, etc. Nobody has ever told me that it is unreasonable to ask court personnel to listen to a federal operator speak in English and read/respond by emails if they cannot listen, for instance, because their calls are monitored for time limits. All these people have email provided by the federal government. All are presumed to be literate. Every single person I have called today has not had any idea what TRS is. It has taken four hours for me to figure out how the complaint will be filed, served, by whom, at what cost and to report to you why it took four hours instead of the 10 minutes it took back in the days when I could hear well enough to use a telephone. Disparity should be self-evident here.

Printed in Portland, OR 11/29/2011 5:41:54 PM

---

[1] Not all my 2000C complaints HAVE exhibits, some of them are only 3 pp long (see the complaint against COUNTY OF LOS ANGELES, has exhibits re disability and reasonable ADA accommodations available). My goal is to use as few words as humanly possible to tell you about each case. There are a lot of unreported TRS cases but many different agencies involved. I chose to start with courts first, because hang-ups to TRS litigants cause actual real due process and equal protection problems each and every time it happens. I find a great deal of distortion occurs when I do not immediately report the moment it occurs, 180 days is too long; although many victims of TRS abuse have no access to a truly personal computer, many do use public libraries, I note some of the public libraries have TRS blocked without realizing it. Since only two or three of my complaints have any exhibits, from now on it might be easier to attach the form complaint and then a TRS transcript to it, so you can get the facts "from the horse's mouth" so to speak. There is still no direct way to email/fax a TRS transcript immediately at end of call, which would help a great deal in dealing with questions of authenticity that come up in each case over and over again; same questions. It's obvious from formatting/font and the border around the transcript also the footer which is a cleaned up transcript tool which is an original printout from UR RELAY, if FCC can find a way for the saved TRS to be immediately sent to FCC and to anyone who wants to see what they've said, that would be even better.

**FCC Consumer Complaints**

FCC > FCC > Filing Complaint > Submitted Submission

6/9/7/32

Form 2000 - Submission Confirmation

**CONFIRMATION**

FCC Submission Confirmation: 2000C

Acknowledgement of Submission Form ABBY OVATSKY on 11/29/2011, reference number 11-C00050135.

Thank you for your information. The FCC will contact you if additional information is required. Please keep this information for future reference.

ATTENTION: When submitting additional information using this FCC Submission Confirmation sheet, please attach only one unsolicited fax advertisement (or multiple advertisements from the same sender) that matches your complaint number and name or company named in the complaint. FCC NOT advise multiple unsolicited faxes from a fax of sender to a fax this unique case number. Your complaint is subject to be rejected if more than one unsolicited fax advertisement from different senders accompanies this FCC Submission Confirmation sheet.

Please use this page as a Fax Cover Sheet when faxing additional details to the FCC at (866) 418-0232.

FCC Home  |  Search  |  RSS  |  Updates  |  E-Filing  |  Subscribe  |  For Consumers  |  Find People

Federal Communications Commission
445 12th Street SW
Washington, DC 20554
More FCC Contact Information

Phone: 1-888-CALL-FCC (1-888-225-5322)
TTY: 1-888-TELL-FCC (1-888-835-5322)
Fax: 1-866-418-0232
E-mail: fccinfo@fcc.gov

- Privacy Policy
- Website Policies & Notices
- Required Browser Plug-ins
- Freedom of Information Act

**EXHIBIT 3**

Print Form

Approved by OMB
3060-0874
Estimated time per response: 30 minutes

## Form 2000C  - Disability Access Complaint

**Consumer's Information:**

First Name: ABBY                    Last Name: OVITSKY

Company Name: N/A (PARENTADVOCATE)

    (Complete only if you are filing this complaint on behalf of a company or an organization.)

Street Address or Post Office Box Number: 6900 SW 195th AVE 133

City: BEAVERTON                    State: OR    Zip Code: 97007  - 5539

Telephone Number (Residential or Business): (    )     -        Ext:

E-mail Address: ABBY@PARENTADVOCATE.ORG

Are you filing information on behalf of another party, such as client, parent, spouse or roommate?

    ☐ Yes  ☑ No   If yes, complete items a through g.

    a.  Your relationship with the party:

    b.  The party's first name:

    c.  The party's last name:

    d.  The party's daytime phone number: (    )     -        Ext:

    e.  The party's street address or post office box number:

    f.  City:                    State:      Zip Code:       -

    g.  E-mail Address:

***IMPORTANT:*** Please indicate the preferred format or method of response to the complaint by the Commission and defendant: ☐ Letter  ☐ Facsimile (fax)  ☐ Telephone Voice  ☐ TTY  ☑ Internet E-mail  ☐ ASCII Text  ☐ Audio-Cassette Recording  ☐ Braille  ☐ TRS (designate form of TRS and appropriate contact information)

    * * * ANSWER EACH QUESTION THAT APPLIES TO YOUR SPECIFIC COMPLAINT * * *

1. Check the appropriate box for your type of complaint:

    ☑ Telecommunications Relay Service (TRS)
    *(i.e.,* TTY-based, IP Relay, CapTel, IP CapTel, Speech-to-Speech, Video Relay Service (VRS))

    ☐ Accessibility of emergency information on television

    ☐ Closed Captioning

    ☐ Wireless telephone equipment or service (includes hearing aid compatibility and other accessibility issues)

    ☐ Wireline telephone equipment or service (includes hearing aid compatibility and other accessibility issues)

February 2010

2. Provide the name, address and telephone number (if known) of the company(s) involved in your complaint:

   Name: STATE OF WASHINGTON: OFFICE OF ADMINISTRATIVE HEARINGS

   City: OLYMPIA _____   State: WA   Zip Code: 98010 - ____

   Telephone number: ( 206 ) 389 - 3400

3. If your complaint is about accessibility of telecommunications services or equipment, provide the make and model number of the equipment or device that this complaint is about:
   NEXTALK/UR RELAY Client Ver. 7.0, Server Ver. 7.1 (TRS) _____

4. If your complaint is about closed captioning or emergency information on television, provide the date (mm/dd/yyyy) __ / __ / ____   and time _____  ○ AM  ○ PM
   and any details of when the event or action you are complaining about occurred:
   _____
   _____
   _____

5. If your complaint is about access to emergency information on television, provide the following information:
   a. Television station call sign and network name (if applicable), or channel name
      (e.g., "WZUF, CBC," "WZUE-TV," "Sportingchannel West"): _____
   b. Channel (e.g., "13"): _____
   c. Station or subscription TV provider system location: City: _____  State: ____
      County: _____
   d. Date(s) and time(s) of emergency: __ / __ / ____   and time _____  ○ AM  ○ PM
   e. Detailed description of the emergency (i.e., flood, hurricane, tornado, etc., as well as the areas in which the emergency occurred): _____
      _____
      _____

6. If your complaint is about closed captioning, provide the following:
   a. Television station call sign and network name (if applicable), or channel name
      (e.g., "WZUF, CBC," "WZUE-TV," "Sportingchannel West"): _____
   b. Channel (e.g., "13"): _____
   c. Station or subscription TV provider system location: City: _____
      County: _____   State: ____
   d. If you pay to receive television programming, type of subscription service (e.g., cable, satellite):
      _____
   e. If you pay to receive television programming, name of company to whom you subscribe:
      _____
      _____

February 2010

7.   1   Name of program(s) involved:

7. Briefly describe your complaint and include the resolution you are seeking. If applicable, provide a full description of the telecommunications equipment or customer premises equipment (CPE) and/or the telecommunications service about which the complaint is made, and the date or dates on which the complainant either purchased, acquired or used, or attempted to purchase, acquire or use the telecommunications equipment, CPE or telecommunications service about which the complaint is being made. ALJ Michelle Mentzer refused to comply with FCC rules re interruptions, prejudicing the plaintiff/parent. She then ordered use of written declarations and email, however it appears the judge either refused to read or ignored most if not all of plaintiff's written communications.

## Form 2000C  - Disability Access Complaint

You may submit this form over the Internet at http://esupport.fcc.gov/complaints.htm, by e-mail to fccinfo@fcc.gov, by fax to 1-866-418-0232, or by postal mail to:

> Federal Communications Commission
> Consumer & Governmental Affairs Bureau
> Consumer Complaints
> 445 12th Street, SW
> Washington, D.C. 20554

In addition, you may submit your complaint over the telephone by calling 1-888-CALL-FCC or 1-888-TELL-FCC (TTY). If you choose to submit your complaint over the telephone, an FCC customer service representative will fill out an electronic version of the form for you during your conversation. If you have any questions, feel free to contact the FCC at 1-888-CALL-FCC or 1-888-TELL-FCC (TTY).

FCC NOTICE REQUIRED BY THE PAPERWORK REDUCTION ACT AND THE PRIVACY ACT

The Federal Communications Commission is authorized under the Communications Act of 1934, as amended, to collect the personal information that we request in this form. This form is used for complaints that involve disability access. The public reporting for this collection of information is estimated to average 30 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the required data, and completing and reviewing the collection of information. If you have any comments on this burden estimate, or how we can improve the collection and reduce the burden it causes you, please write to the Federal Communications Commission, OMD-PERM, Paperwork Reduction Project (3060-0874), Washington, DC 20554. We will also accept your comments regarding the Paperwork Reduction Act aspects of this collection via the Internet if you send them to PRA@fcc.gov. PLEASE DO NOT SEND YOUR COMPLETED FORMS TO THIS ADDRESS.

Remember - You are not required to respond to a collection of information sponsored by the Federal government, and the government may not conduct or sponsor this collection, unless it displays a currently valid OMB control number or if we fail to provide you with this notice. This collection has been assigned an OMB control number of 3060-0874.

In addition, the information that consumers provide when filing out FCC Form 2000 is covered by the system of records notice, FCC/CGB-1, Informal Complaints and Inquiries File (Broadcast, Common Carrier, and Wireless Telecommunications Bureau Radio Services). The Commission is authorized to request this information from consumers under 47 U.S.C. 206, 208, 301, 303, 309(e), 312, 362, 364, 366, 507, and 51; and 47 CFR 1.711 et seq.

Under this system of records notice, FCC/CGB-1, the FCC may disclose information that consumers provide as follows: when a record in this system involves a complaint against a company, the complaint is forwarded to the defendant who must, within a prescribed time frame, either satisfy the complaint or explain to the Commission and the complainant its failure to do so, where there is an indication of a violation or potential violation of a statute, regulation, rule, or order, records from this system may be referred to the appropriate Federal, state, or local agency responsible for investigating or prosecuting a violation or for enforcing or implementing the statute, rule, regulation, or order; a record from this system may be disclosed to a Federal agency, in response to its request, in connection with the hiring or retention of an employee, the issuance of a security clearance, the reporting of an investigation of an employee, the letting of a contract, or the issuance of a license, grant or other benefit; a record on an individual in this system of records may be disclosed, where pertinent, in any legal proceeding to which the Commission is a party before a court or adjudicative body when: (a) the United States, the Commission, a component of the Commission, or when represented by the government, an employee of the Commission is a party to litigation or anticipated litigation or has an interest in such litigation, and (b) the Commission determines that the disclosure is relevant or necessary to the litigation; a record from this system of records may be disclosed to a Congressional office in response to an inquiry the individual has made to the Congressional office, a record from this system of records may be disclosed to GSA and NARA for the purpose of records management inspections conducted under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall not be used to make a determination about individuals.

In each of these cases, the FCC will determine whether disclosure of the information in this system of records notice is compatible with the purpose for which the records were collected. Furthermore, information in this system of records notice is available for public inspection after redaction of information that could identify the complainant or correspondent, i.e., name, address and/or telephone number.

THE FOREGOING NOTICE IS REQUIRED BY THE PAPERWORK REDUCTION ACT OF 1995, PUBLIC LAW 104-13, OCTOBER 1, 1995, 44 U.S.C. SECTION 3507 AND THE PRIVACY ACT OF 1974, PUBLIC LAW 93-579, DECEMBER 31, 1974, 5 U.S.C. SECTION 552a(e)(3).

February 2010

MAR 28 2011
SEATTLE-OAH

STATE OF WASHINGTON

## OFFICE OF ADMINISTRATIVE HEARINGS

*One Union Square Suite 1500 • 600 University Street • Seattle WA 98101*
*(206) 389-3400 • (800) 845-8830 • FAX (206)587-5135 • www.oah.wa.gov*

March 28, 2011

Parent
15420 Mill Creek Blvd #O-204
Mill Creek, WA 98012
*via US mail and E-mail*

Kristen K. Waggoner, Attorney at Law
Geoffrey Enns, Attorney at Law
Ellis, Li & McKinstry PLLC
Market Place Tower
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
*via US mail and E-mail*

In re:   Monroe School District, Student Transfer Cause No. 2011-ST-0002

Dear Parent and Counsel:

Here is another idea for conducting the hearing in this case. Please let me know if you think this will work.

Does the Parent have a cell phone she uses for text messaging? If not, her son or an acquaintance may have a cell phone she could borrow for the hours of the hearing. The cell phone would be set on vibrate. The Parent would put the cell phone in her pocket or on her lap where she could feel the vibration. I would test the cell phone at the beginning of the hearing. Any time I need to interject, I would press "redial" to call the Parent's cell phone. I would let it ring (vibrate) twice, then hang up. (This would be done on a separate line from the line on which the hearing is taking place.) If Ms. Waggoner orally states an objection, I would do a similar call.

Immediately upon feeling the cell phone vibrate, the Parent would stop typing. The Parent would not begin typing again until I state that she may.

If the Parent wishes to make an objection, she can make the call in reverse: use the cell phone -- or preferably a separate phone line -- to call me. Two rings and then hanging up will signal me that the Parent wishes to make an objection. I can then orally tell the person speaking to pause while the Parent types her objection and I rule on it.

This system will only work if the parties think carefully before making an objection, and do not make unnecessary objections. Because the Parent is *pro se,* prior to the hearing I would send a list of common objections and what they mean. I do not allow "speaking objections" in any of my hearings. A speaking objection is where the person making the objections explains it at length. I allow only one-phrase objections, e.g. "Objection – lack of foundation" "Objection – hearsay" "Objection – relevance, " etc. I will send a more complete list of these, and what they

mean, in advance of the hearing.  But I want the parties to understand that the phrase objections.

   If we begin the hearing with this process and it does not work well, I will adjourn the hearing for the day and consider whether there is another way of conducting it.

   Thank you for your prompt response on this matter.

   Sincerely,

   *Matthew D. Wacker*

for   Michelle C. Mentzer
      Administrative Law Judge

   cc:   Lara Cole, Executive Director, Student Services
         Administrative Resource Services, OSPI
         Matthew D. Wacker, Sr. ALJ, OAH/OSPI Caseload Coordinator

Monroe
Cause No. 2011-ST-0002
Page 2

**148**

MAR 14 2011
SEATTLE-OAH

STATE OF WASHINGTON
## OFFICE OF ADMINISTRATIVE HEARINGS
One Union Square Suite 1500 • 600 University Street • Seattle WA 98101
(206) 389-3400 • (800) 845-8830 • FAX (206)587-5135 • www.oah.wa.gov

March 14, 2011

Parent
15420 Mill Creek Blvd #O-204
Mill Creek, WA 98012
*via US mail and E-mail*

Kristen K. Waggoner, Attorney at Law
Ellis, Li & McKinstry PLLC
Market Place Tower
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
*via US mail and E-mail*

In re:  Monroe School District, Student Transfer Cause No. 2011-ST-0002

Dear Parent and Counsel:

In response to my letter to you of March 7, 2011, the Parent sent several emails to my assistant on March 8, with copies to the school district's attorney. Prior to receiving the Parent's emails, I thought the Parent used live relay service due to deafness. It appears from the emails that she has some hearing problems, but also uses live relay due to other disabilities, and those disabilities would make it difficult for her to attend an in-person hearing.

The Parent's emails contained a lot of helpful information, but they did not address the two main concerns in my March 7 letter: The inability of parties to interject objections on live relay, and my inability to interject in order to guide the proceedings.

Our hearing could be conducted by telephone using live relay provided there is a way I can signal the parties to stop speaking (or typing) so that I may guide the proceedings. I appreciate the Parent stating in one of her March 8 emails: "what else can i do to meet your needs so that mine are also met?"  Here is one possible solution, and I am open to hearing others.

A similar problem occurs during telephone hearings when parties are using speaker phones: The one-way nature of many speaker phones makes interjection difficult (though not impossible, as it is with live relay).  In such situations, I inform the parties that if I need to interject I will press any key on my telephone keypad and they will bear a beep. This signals them to pause in their speaking so that I may interject. Likewise if a party wishes to make an objection, they may press any key to produce a beep so that the speaker will pause.

Without such a signal, conducting our hearing by live relay is not workable. This was clear during the first part of the hearing we held on February 22, 2011.  If the only problem were participants speaking too quickly for the communications assistants to type, that would be easily solvable.

If the parties do not wish to go ahead with proposal above, the Office of Administrative Hearings can investigate whether there are any other options for conducting the hearing. Thank you in advance for sending any suggestions you may have. You may send your responses by email to

Monroe School District
Cause No. 2011-ST-0002
Page 1

158

my assistant, as previously, if you prefer that to mailing a letter. If this matter is not resolved before our next hearing date, April 21, 2011, the hearing could be continued as necessary.

Sincerely,

Michelle C. Mentzer
Administrative Law Judge

cc:   Lara Cole, Executive Director, Student Services
      Administrative Resource Services, OSPI
      OAH/OSPI Caseload Coordinator

Monroe School District
Cause No. 2011-ST-0002
Page 2

**159**

STATE OF WASHINGTON
OFFICE OF ADMINISTRATIVE HEARINGS

One Union Square Suite 1500 • 600 University Street • Seattle WA 98101
(206) 389-3400 • (800) 845-8830 • FAX (206)587-5135 • www.oah.wa.gov

March 7, 2011

Parent

*via US mail and E-mail*

Kristen K. Waggoner, Attorney at Law
Ellis, Li & McKinstry PLLC
Market Place Tower
2025 First Avenue, Penthouse A
Seattle, WA 98121-3125
*via US mail and E-mail*

In re:  Monroe School District, Student Transfer Cause No. 2011-ST-0002

Dear Parent and Counsel:

I have decided that the continued hearing in this matter on April 21, 2011 will be held in person rather than by telephone. The live relay service by telephone deprives the parties of the opportunity to interject objections, because no interruptions are allowed. It also impedes my ability to guide the proceedings because I am unable to interject. In addition, we had significant problems with participants speaking too fast for the live relay communication assistants (CAs) to type. Some of the CAs typed significantly more slowly than others, and the speakers could not ascertain this until the Parent had already been deprived of a clear understanding of the proceedings and testimony had to be repeated.

I will be issuing an order changing the hearing to an in-person proceeding. The purpose of this letter is to discuss logistics and to request input from the parties before I issue that order.

If the Parent uses sign language, we will use professional sign language interpreters. I have done several hearings using such interpreters, who come in pairs to provide relief to one another. Sign language interpreters can interpret the testimony of telephone witnesses in the event a particular witness cannot appear in person (e.g., due to distance from the hearing location).

If the Parent does not use sign language, we can use the live relay service but all be gathered in one room. That way parties can visibly motion when they wish to interject an objection, and the person speaking or typing will be required to stop until the objection is heard and I have ruled on the objection. Likewise I can visibly motion when I need to interject, and the person speaking or typing will be required to stop when I do so.

If the Parent uses sign language, that is how the hearing is going to proceed. The sign language interpreters we use are certified professionals who are sworn to operate under the Washington Code of Conduct for Interpreters. Live relay CAs are not. The Parent may prefer live relay because it is simultaneously typed and she can obtain a transcript. However, no party has a right to a transcript in these proceedings. The School District will not receive one, and the Parent does not have a right to one either.

The Parent is free to bring her laptop computer to the hearing. She has stated she is able to see exhibits better on a screen than on paper, due to a vision disability. If she wishes to have a second screen for taking notes, she may bring her second screen. If she is unable to transport her second screen, we will endeavor to have an extra monitor and technical support available at the hearing site to connect her laptop to an extra monitor.

Regarding the location for the hearing, we usually conduct our in-person hearings at school district administrative offices, and occasionally at law offices. I have done in-person hearings at the Monroe School District administrative offices in the past and found the facilities quite adequate. Ms. Waggoner, please inquire about the availability of this venue.

I am in receipt of the Parent's email to my assistant dated February 28, 2011. I was out of state at that time and went immediately into a hearing out of town, thus have been delayed in responding. In the email, the Parent requests reconsideration of the denial of her motion to strike a portion of Susan Stewart's testimony. The portion in question is Ms. Stewart characterization of prior statements by the Parent to a School District employee as harassing and intimidating. When we are back on the record on April 21, 2011, I will be denying the request to reconsider this ruling. The witness is free to characterize what she read of the Parent's conversation (which was in live relay transcript) as she perceived it. The Parent may question the witness about this, and may testify about it herself when she is the witness. However, I will not allow more than very brief questioning or testimony on this matter. How this witness perceived the conversation is of very little relevance. This is especially true where, as here, the transcript of the conversation is an exhibit and speaks for itself. As mentioned above, I do not issue rulings by letter; I will be stating this ruling on the record when we reconvene.

Regarding other matters in the Parent's email of February 28, 2011, the parties will have an opportunity to submit written argument after the hearing is concluded. It will not be accepted prior to that time. The due date for the submission of closing arguments will be set at the end of the hearing.

You may respond by email to my assistant regarding the questions posed above concerning arrangements for the hearing. There is no need for you to put your responses in letter format if you do not wish to do so. Thank you for your attention to this matter.

Sincerely,

for   Michelle C. Mentzer
Administrative Law Judge

cc:    Lara Cole, Executive Director, Student Services
       Administrative Resource Services; OSPI
       OAH/OSPI Caseload Coordinator

**EXHIBIT  4**

Print Form

Approved by OMB
3060-0874
Estimated time per response: 30 minutes

## Form 2000C  - Disability Access Complaint

**Consumer's Information:**

First Name: ABBY        Last Name: OVITSKY

Company Name: N/A (PARENTADVOCATE)

(Complete only if you are filing this complaint on behalf of a company or an organization.)

Street Address or Post Office Box Number: 6900 SW 195TH AVE #133

City: BEAVERTON        State: OR   Zip Code: 97007 - 5539

Telephone Number (Residential or Business): (     )        -        Ext:

E-mail Address: ABBY@PARENTADVOCATE.ORG

Are you filing information on behalf of another party, such as client, parent, spouse or roommate?

☐ Yes  ☑ No   If yes, complete items a through g.

a.  Your relationship with the party:

b.  The party's first name:

c.  The party's last name:

d.  The party's daytime phone number: (     )        -        Ext:

e.  The party's street address or post office box number:

f.  City:        State:        Zip Code:        -

g.  E-mail Address:

**IMPORTANT:** Please indicate the preferred format or method of response to the complaint by the Commission and defendant: ☐ Letter  ☐ Facsimile (fax)  ☐ Telephone Voice  ☐ TTY  ☐ Internet E-mail  ☐ ASCII Text  ☐ Audio-Cassette Recording  ☐ Braille  ☐ TRS (designate form of TRS and appropriate contact information)

**\* \* \* ANSWER EACH QUESTION THAT APPLIES TO YOUR SPECIFIC COMPLAINT \* \* \***

1. Check the appropriate box for your type of complaint:

☑ Telecommunications Relay Service (TRS)
*(i.e.,* TTY-based, IP Relay, CapTel, IP CapTel, Speech-to-Speech, Video Relay Service (VRS))

☐ Accessibility of emergency information on television

☐ Closed Captioning

☐ Wireless telephone equipment or service (includes hearing aid compatibility and other accessibility issues)

☐ Wireline telephone equipment or service (includes hearing aid compatibility and other accessibility issues)

EX 4

**Form 2000C - Disability Access Complaint**
*** ANSWER EACH QUESTION THAT APPLIES TO YOUR SPECIFIC COMPLAINT ***

2. Provide the name, address and telephone number (if known) of the company(s) involved in your complaint:

Name: County of Los Angeles-Department of Children and Family Services--SPA5

City: Los Angeles                         State: CA    Zip Code: 90036 - _____

Telephone number: ( 323 ) 900 - 2222

3. If your complaint is about accessibility of telecommunications services or equipment, provide the make and model number of the equipment or device that this complaint is about:
NEXTALK/UR RELAY Client Ver. 7.0, Server Ver. 7.1 (TRS)

4. If your complaint is about closed captioning or emergency information on television, provide the date (mm/dd/yyyy) ___ / ___ / _____    and time _____  ⦿ AM  ⦿ PM
and any details of when the event or action you are complaining about occurred:

_____
_____

5. If your complaint is about access to emergency information on television, provide the following information:
   a. Television station call sign and network name (if applicable), or channel name
      (e.g., "WZUF, CBC," "WZUE-TV," "Sportingchannel West"): _____
   b. Channel (e.g., "13"): _____
   c. Station or subscription TV provider system location: City: _____
      County: _____                    State: _____
   d. Date(s) and time(s) of emergency: ___ / ___ / _____    and time _____   ⦿ AM  ⦿ PM
   e. Detailed description of the emergency (i.e., flood, hurricane, tornado, etc., as well as the areas in which the emergency occurred): _____
      _____
      _____

6. If your complaint is about closed captioning, provide the following:
   a. Television station call sign and network name (if applicable), or channel name
      (e.g., "WZUF, CBC," "WZUE-TV," "Sportingchannel West"): _____
   b. Channel (e.g., "13"): _____
   c. Station or subscription TV provider system location: City: _____
      County: _____                    State: _____
   d. If you pay to receive television programming, type of subscription service (e.g., cable, satellite):
      _____
   e. If you pay to receive television programming, name of company to whom you subscribe:
      _____

February 2010

f. Name of program(s) involved: _____

7. Briefly describe your complaint and include the resolution you are seeking.  If applicable, provide a full description of the telecommunications equipment or customer premises equipment (CPE) and/or the telecommunications service about which the complaint is made, and the date or dates on which the complainant either purchased, acquired or used, or attempted to purchase, acquire or use the telecommunications equipment, CPE or telecommunications service about which the complaint is being made.  CPS signed a "Primary Language Designation Form For Parents/Legal Guardians" on 7.10.08 stating agency is aware parent is deaf, requires use of "English through Relay," that is the above service and/or equivalent WRITTEN COMMUNICATION, then at all times ignored it.

## Form 2000C  - Disability Access Complaint

You may submit this form over the Internet at http://esupport.fcc.gov/complaints.htm, by e-mail to fccinfo@fcc.gov, by fax to 1-866-418-0232, or by postal mail to:

Federal Communications Commission
Consumer & Governmental Affairs Bureau
Consumer Complaints
445 12th Street, SW
Washington, D.C. 20554

In addition, you may submit your complaint over the telephone by calling 1-888-CALL-FCC or 1-888-TELL-FCC (TTY). If you choose to submit your complaint over the telephone, an FCC customer service representative will fill out an electronic version of the form for you during your conversation. If you have any questions, feel free to contact the FCC at 1-888-CALL-FCC or 1-888-TELL-FCC (TTY).

**FCC NOTICE REQUIRED BY THE PAPERWORK REDUCTION ACT AND THE PRIVACY ACT**

The Federal Communications Commission is authorized under the Communications Act of 1934, as amended, to collect the personal information that we request in this form. This form is used for complaints that involve disability access. The public reporting for this collection of information is estimated to average 30 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the required data, and completing and reviewing the collection of information. If you have any comments on this burden estimate, or how we can improve this collection and reduce the burden it causes you, please write to the Federal Communications Commission, OMD-PERM, Paperwork Reduction Project (3060-0874), Washington, DC 20554. We will also accept your comments regarding the Paperwork Reduction Act aspects of this collection via the Internet if you send them to PRA@fcc.gov. PLEASE DO NOT SEND YOUR COMPLETED FORMS TO THIS ADDRESS.

Remember - You are not required to respond to a collection of information sponsored by the Federal government, and the government may not conduct or sponsor this collection, unless it displays a currently valid OMB control number or if we fail to provide you with this notice. This collection has been assigned an OMB control number of 3060-0874.

In addition, the information that consumers provide when filling out FCC Form 2000 is covered by the system of records notice, FCC/CGB-1, Informal Complaints and Inquiries File (Broadcast, Common Carrier, and Wireless Telecommunications Bureau Radio Services)  The Commission is authorized to request this information from consumers under 47 U.S.C. 206, 208, 301, 303, 303(e), 312, 362, 364, 386, 507, and 51; and 47 CFR 1.711 *et seq.*

Under this system of records notice, FCC/CGB-1, the FCC may disclose information that consumers provide as follows: when a record in this system involves a complaint against a company, the complaint is forwarded to the defendant who must, within a prescribed time frame, either satisfy the complaint or explain to the Commission and the complainant its failure to do so; where there is an indication of a violation or potential violation of a statute, regulation, rule, or order, records from this system may be referred to the appropriate Federal, state, or local agency responsible for investigating or prosecuting a violation or for enforcing or implementing the statute, rule, regulation, or order; a record from this system may be disclosed to a Federal agency, in response to its request, in connection with the hiring or retention of an employee, the issuance of a security clearance, the reporting of an investigation of an employee, the letting of a contract, or the issuance of a license, grant or other benefit; a record on an individual in this system of records may be disclosed, where pertinent, in any legal proceeding to which the Commission is a party before a court or administrative body; a record from this system of records may be disclosed to the Department of Justice or in a proceeding before a court or adjudicative body when: (a) the United States, the Commission, a component of the Commission, or, when represented by the government, an employee of the Commission is a party to litigation or anticipated litigation or has an interest in such litigation, and (b) the Commission determines that the disclosure is relevant or necessary to the litigation; a record on an individual in this system of records may be disclosed to a Congressional office in response to an inquiry the individual has made to the Congressional office; a record from this system of records may be disclosed to GSA and NARA for the purpose of records management inspections conducted under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall not be used to make a determination about individuals.

In each of these cases, the FCC will determine whether disclosure of the information in this system of records notice is compatible with the purpose for which the records were collected. Furthermore, information in this system of records notice is available for public inspection after redaction of information that could identify the complainant or correspondent, i.e., name, address and/or telephone number.

THE FOREGOING NOTICE IS REQUIRED BY THE PAPERWORK REDUCTION ACT OF 1995, PUBLIC LAW 104-13, OCTOBER 1, 1995, 44 U.S.C. SECTION 3507 AND THE PRIVACY ACT OF 1974, PUBLIC LAW 93-579, DECEMBER 31, 1974, 5 U.S.C. SECTION 552a(e)(3).

February 2010

COUNTY OF LOS ANGELES - DEPARTMENT OF CHILDREN AND FAMILY SERVICES
## PRIMARY LANGUAGE DESIGNATION FORM
### FOR PARENTS/LEGAL GUARDIANS/CHILDREN

Case Name: Abby Ovitsky

Case Number: _____

The primary language for this case is:

Parent(s)/Guardian(s):  ☑ English  ☐ Spanish  ☐ Other _____
through Relay                                                    Specify

Child(ren):  ☑ English  ☐ Spanish  ☐ Other _____
                                              Specify

If any language other than English is checked, a bilingual CSW is to be assigned.

I hereby ☑ agree ☐ disagree that I and my minor child(ren) or the related child(ren) in my care are able to communicate effectively in the language(s) designated above.

I understand that I have the right to speak to a supervisor if I disagree with this language designation. This determination take the place of any previous determination.

Parent/Guardian Signature (Parent/Guardian signs for children)          Date 7/10/08

Caregiver Signature

Children's Social Worker Signature          File #          Date 7/10/08

Instructions:
* The ER worker is to complete one form for the entire family at the inception of services, i.e., the first ER visit with the parent(s)/guardian(s).
* If one member of the family is monolingual, the primary language for that case is that family member's language.
* The parent(s)/guardian(s)/caregiver(s) indicates agreement or disagreement with the primary language designation by signing the form. The parent/guardian/caregiver signs for him/herself AND their minor children. In cases where an older child has no parent/guardian, the child may sign for him/herself.
* The form is completed only one time unless a new family member (of speaking age) is added to the case.
* If the added person does not change the current designation, the current form implies applicability to the added person and no further action (no new or revised form) is necessary.
* If the added person changes the language designation, a new form is required.
* When a new case is a RE-OPENING on CIS, the language designation should already be coded on CIS. It is only necessary to confirm that the language designation is correct for each person.
* IF IT IS NOT CORRECT ON CIS, use the TA Action Request to effect the correct language code.
* IF IT IS A NEW CASE NOT PREVIOUSLY KNOWN TO CIS, use information on the DCFS 485 to establish CIS information OR to amend information entered at initial referral which may turn out to be incorrect.
* A copy of the Primary Language Designation Form is given to the caregiver at initial placement and each replacement.

DCFS case records are confidential pursuant to WIC Section 827 and order of the Los Angeles County Juvenile Court.

Filing: Case Activity Record Folder          Retention: Permanent

76P939 DCFS 485 (Rev. 6/96)

(Español - Reverso)



Judith W. Paton, MA, FAAA
Audiology – Pediatric and Adult
136 North San Mateo Drive, Suite 104
San Mateo, CA 94401    (650) 340-1280
www.judithpaton.com

Re: OVITSKY, ABBY                                        Test date:  8-10 and 9-8-06
Age:  47                                                        Birthdate: 8-25-58

### CENTRAL AUDITORY PROCESSING EVALUATION

HISTORY:  Ms. Ovitsky has extreme difficulty hearing under certain listening conditions which do not
seem to affect other people with equally good peripheral hearing.  She had some mild aspects of this
growing up, but after a closed head injury in a car accident several years ago her problems became almost
incapacitating.  She has an uncompleted law degree and has worked for lawyers for many years.
        Ms. Ovitsky's concerns about her hearing include:
1)  Marked difficulty understanding speech if there is any background noise (e.g. air conditioner, car,
instrumentation accompanying lyrics, or even another person talking).  "It's like --- my brain erases the
part that overlaps --- like all I hear is sound, not words, it's gibberish."
2)  Even greater problems understanding on the phone, where she can't lip-read (in between tests here she
unfailingly put her glasses on so she could follow what I was saying).
3)  Rapid speech is almost impossible to decipher:  " --- sometimes I 'get it' a minute or two after the
speaker speaks, but I am literally replaying the sound in my mind over and over trying to figure it out."
4)  Great trouble with word-finding at times, even for fairly common words.  On both days on the verbal
portion of the PPS test (see Appendix) she reacted strongly against having to label three-note tonal patterns
with words (e.g. "low-high-low"); the first day, she became so asthmatic that she had to leave in the middle
of the test; the second day she became extraordinarily agitated and disturbed by the demands of the task,
saying only, "I can't do it!"
5)  Imperceptive of tone of voice – both her own and others', which has led to serious misunderstandings
and even affected her job
6)  Hyperacusis (unusual sensitivity to certain sounds):  lifelong, but much worse after the accident; now
certain sounds which other people tolerate feel "like a dentist's drill" to her (e.g. a dog barking, the bells in
department stores, car alarms, or a baby's cry); certain voices are actually irritating to her hearing.
7)  Can no longer do the jobs she was trained for, which include transcription from tapes of various
lawyers; along with telephone work and strong demands to multi-task.
8)  Other auditory concerns appear on attached CAPD by Region checklist.
        A partial health history is noteworthy for:
1)  Diagnosis of mild brain trauma after the car she was driving rolled over twice and she suffered blows to
the top and back of her head.
2)  Immune system problems.
3)  Has had bad reactions to some medications taken in the past, and is currently trying a nutritional
approach.

AUDIOLOGIC TEST RESULTS (see APPENDIX):  Audiologic results are consistent with a significant
central auditory processing disorder (CAPD), as shown by abnormal findings on tests considered sensitive
to both brain stem and cerebral level auditory system dysfunction.  The audiologic tests are site-of-lesion
tests originally researched with surgically or radiologically confirmed central nervous system disorders and
later re-normed on school-aged children.  The normal limit is set above -2 to –3 SD standard deviations
below the mean, depending on the test.  CAPD is a recognized medical condition with ICD.9 codes.  A
bibliography of the decades of peer-reviewed audiologic, otolaryngology, and neurology journal articles is
available from the American Speech/Hearing/Language Association.

1

DIAGNOSIS CODES:
> 389.14 – Central hearing impairment/388.46 – Abnormal auditory perception
> 388.42 – Hyperacusis

CONCLUSIONS: A CAPD (also termed Auditory Processing Disorder by some professionals) is a physical hearing impairment affecting one of the basic psychological modes of learning. Under civil rights law (including Section 504 of the Rehabilitation Act of 1973 and the Americans with Disabilities Act of 1990) this disability warrants specialized support and modifications at school to help Ms. Ovitsky work up to true intellectual ability.

Ms. Ovitsky's central auditory processing disorder is severe enough that I believe it would be impossible for her to do the job she describes unless some rehabilitation can be offered and some adjustments in the workplace made.

The effects of Ms. Ovitsky's type of hearing impairment, and recommendations of measures which can help, are as follows.

1) **Discomfort and distraction around sounds which would not bother a normal listener** is shown by the history and brain stem test findings (see Appendix). Unable to temper or modulate sound stimuli coming in from the ear, Ms. Ovitsky is chronically stressed and uncomfortable from the low-level irritation of what is, for the rest of us, perfectly ordinary sensory stimulation.

Some hyperacusis sufferers are so affected by the discomfort from sounds which normal listeners tolerate well that it puts them into almost a "fight/flight" mode and seem at those moments unable to access some of their cognitive abilities. It is at these times when behavior can become out-of-bounds, as the person loses touch with higher brain centers for planning and inhibition.

2) **Auditory figure-ground confusions and difficulty suppressing unwanted background sounds of even mild-to-moderate intensity** at brain stem level (see test results in Appendix) affects Ms. Ovitsky's ability to understand speech and work accurately in ordinary noise. Busy, crowded, and reverberant settings make it difficult for this type of listener to pick out and focus on the speaker's voice. Important words in spoken instruction are thus obscured by a coincidental noise ("it's like my brain erases the part that overlaps").

"Careless" errors tend to occur on exacting work as random sounds, which a normal-hearing student could ignore, take Ms. Ovitsky momentarily off-task and cause her to inadvertently skip a step. This is one reason why she can't multi-task in a busy office.

Ms. Ovitsky has an extreme version of these types of noise suppression problems. The fastest way I know to train better noise suppression is a ten-day AIT (Auditory Integration Training) program. However, since there are no true peaks of hyperacusis in Ms. Ovitsky's audiogram, an easier and cheaper solution would be to follow the AIT protocol with an BASe Disc #1 and #2 home listening program, which is "generic" AIT (888/213-7858, vision-audio.com). I will be glad to advise on administration. If, on the other hand, that music proves uncomfortable at moderate volume, it means that she will need her best thresholds filtered out, which would require the in-office AIT where those peaks can be filtered.

3) **Distortion of speech phonemes due to slow auditory processing speed** (see RBDT and TCST findings in Appendix) causes similar-sounding words to be confused and is also a severe problem for Ms. Ovitsky. The auditory clues which help us hear running speech clearly generally occur in a very short time window (5-40 milliseconds). People who cannot process at this split-second rate tend to fatigue and become less and less able to identify words for longer units of speech, so that the words start to sound "garbled."

These misperceptions must be detected and corrected higher up on an intellectual basis from the context, a tiring extra step which normal-hearing students need not take. Moreover, when the vocabulary is new and the student has no experience from which to guess, the information is lost altogether and guesswork about subsequent words and sentences becomes less accurate.

Ms. Ovitsky is keenly aware of her limitations when people speak too fast or too long. She tries to compensate by lip-reading, or by "replaying the sound over and over in my mind trying to figure it out." This serious hearing impairment limits her ability to take in lengthy instruction, as for lectures and meetings, and for quick-paced remarks like social banter or workplace assignments delivered "on the fly."

2

For a recently published description of the comprehension and memory demands of these types of processing see: Vaughn, N., Storzbach, D., and Furukawa, L. (2006) Sequencing versus Nonsequencing Working Memory in Understanding of Rapid Speech by Older Listeners. *J. Amer. Acad. Audiology* 17:506-518).

4) **Imperception of melody and prosody as clues to meaning** is another effect of slow processing speed or gap detection. The meaning of spoken language can change dramatically depending on the speaker's tone of voice. A boss's emphasis, a friend's mounting irritation, or the subtle social currents in groups can be easily misjudged by people who do not pick up subtle tone of voice. Ms. Ovitsky knows she can't even detect an undesirable tone in her own voice, which has caused some serious miscommunications.

If voices come across as a relative monotone, Ms. Ovitsky may not pick up differences between "I saw the car go" and "I saw the cargo," or be able to pick up the word the teacher is emphasizing. It would be hard for any of us to stay attentive to instruction we perceived in an unvarying tone. Also, when words are distorted or are partially obscured by background noise, we rely even more on the expression behind the remark to help us guess at what was said.

The fastest way I know to train auditory processing speed and phonemic/melodic perception is, again, AIT (or possibly EASe Disc).

5) **Problems with short term auditory and rote memory** often accompany other kinds of brain stem auditory dysfunction in my CAPD caseload. When short term memory is inadequate, as shown in Sound Blending testing (see Appendix) and reported in the workplace, the remainder of a sentence may be lost while a distorted or obscured word is being identified. Lengthy spoken instruction (including assignments or test directions) or steps in complex operations (like punctuation in writing, taking notes, or solving higher level math computations) may be forgotten.

People like Ms. Ovitsky in this CAPD subgroup can have high intelligence yet retain information poorly when it is taught by drill or repetition, without supporting detail or logic. Unfortunately, this is how many basic literacy skills (math facts and formulae, the fine points of spelling and punctuation, and foreign language vocabulary and grammar) are taught, and many students with poor rote memory have failed to habituate and retain these tools. Test-taking is slowed because of the need to search for facts which students without this low-level memory deficit have immediately available.

Work with an educational or language therapist can help inculcate cognitive memory strategies for these low-level memory deficits. Poor short term memory also tends to occur with depression, so any help in this area will also support better working memory.

6) **Problems with language functions like intuition of the basic rules of language, word-finding, accessing word meanings, and/or perceiving grammatical clues to meaning** at posterior temporal lobe level (see Dichotic Competing Sentences test in Appendix) are another serious handicap for Ms. Ovitsky. In fact, the Dichotic Competing Sentence test scores were among the lowest of any found today.

Word-finding is known to be a problem for Ms. Ovitsky in daily life, and made her completely unable to do the simple labeling on the PPS test without the crutch of using singing to access the simple words. It also added to her frustration when asked to forgo that coping strategy, causing her to "act out" rather than "talk it out."

These listeners can have trouble tabulating the ongoing stream of linguistic data, noting similarities, and generalizing them into rules. They often have poor access to the full English lexicon (rules of probability in language) which helps them make logical predictions about what they missed or what they should expect to hear next. This is another reason why there is a delay before Ms. Ovitsky "gets" a remark.

7) **Difficulty acquiring and/or accessing more abstract word meanings**, signaled by anterior temporal lobe findings (see SSW in Appendix), also causes serious misunderstandings. It is as if "the whole menu doesn't come up" when Ms. Ovitsky must choose the most appropriate word meaning for the context. Instead, she will to perceive (and perhaps frame) spoken remarks too literally, which results in hurt feelings or confusion. She may need to ask extra informational questions to get a more accurate idea of what was said, although this can give the wrong impression in the workplace and may be impractical in a large college class. The more abstract the instruction and reading become, the more this poor accessing begins to affect reading comprehension.

3

Both temporal lobe findings further demonstrate an anatomical basis to Ms. Ovitsky's communication problems and strongly support the need for intensive, skilled language therapy.

RECOMMENDATIONS:
1) Therapies:

    a) Ten-day RASe Disc program , which can be done at home at low cost. If it is not comfortable or successful, consider AIT.

    b) Consider consult with DANI Panel physician or other specialist who understands the relationship between the immune system and brain function, so that Ms. Ovitsky follows the most suitable nutritional approach for her own body chemistry.

    c) Consider EEG Neurofeedback if these measures are not enough to make her hearing serviceable.

    d) Assistance from the California Department of Rehabilitation's Hearing Impaired counselors (since there is probably no specialist in CAPD) for training for a profession suitable for Ms. Ovitsky's hearing limitations.

    e) Work with educational or language therapist on cognitive memory strategies.

    f) Work on word-finding and any other language problems with speech/language pathologist who is skilled with subtle language disorders in bright adults.

    g) Consider EEG Neurofeedback to train better voluntary control over brain function (e.g. depression, anger, temporal lobe efficiency).

2) Workplace and educational accommodations:

    a) Use of Relay Operator for all phone calls, unless Ms. Ovitsky can be successfully trained in use of TTY (which has not been possible so far). Her job should not involve telephone work unless a suitable system can be worked out.

    b) All workplace and school assignments given in full detail in writing (or by email), not just spoken. Minutes should be provided for all workplace meetings, and a note-taker should be provided for all classes.

    c) Quiet workplace and test-taking settings.

    d) If a language problem is confirmed, give double time on all tests, including those for professional certification, to allow time for re-interpretation of test questions. Supervisors will also need to accommodate to any delays Ms. Ovitsky might have in accessing her true intelligence when it comes to listening and communication.

Other suggestions appear on the attached chart.

Judith W. Paton, M. A.

4

## APPENDIX
### (see also Audiogram and Central Test Summary sheet)

VALIDITY/RELIABILITY: The high number of normal test findings in several auditory areas and the significant ear differences on some tests rule out lack of cooperation or other "psychological" explanations of the abnormal findings. I consider today's test results a valid and reliable representation of Ms. Ovitsky's present organic hearing.

TEST RESULTS (peripheral):

1) Pure tone thresholds within grossly normal limits in both ears through 6000Hz, though with mild sensorineural threshold depression at most frequencies, and with mild-to-moderate bilateral hearing loss in the high frequencies.
2) Speech reception thresholds of 0dB bilaterally support the pure tone results at the best speech frequencies (though it should be noted that Ms. Ovitsky was quite averse to responding at the "50% level of certainty" generally defined as threshold.
3) Speech discrimination excellent bilaterally in quiet (opposite ear masked).

TEST RESULTS (central):

1) Speech discrimination in ipsilateral noise abnormally poor for the right ear, consistent with brain stem level auditory dysfunction. The normal left ear score shows that Ms. Ovitsky was a reliable test subject.
2) MLD (Masking Level Difference) testing at 500Hz yields abnormally small release from masking, also consistent with brain stem level dysfunction.
3) SSI-ICM (Synthetic Sentence Identification with Ipsilateral Competing Message) test shows abnormally poor performance for both ears in the -20dB S/N condition, and for the left ear in the easier -10dB S/N condition, also brain stem findings.
4) TCST (Time Compressed Sentence Test) yields significantly poorer score for the right ear than the left (34th percentile vs. 72nd, exceeding the allowable 20% ear disparity on this test) in the 60% compression condition. This failure to process simple sentences at this rate is a sign of left temporal lobe dysfunction.
5) RGDT (Random Gap Detection Test) scores (screened binaurally at 500Hz) extremely poor: Ms. Ovitsky, in fact, could not hear a gap between two tones as long as 40 msec. (the adult mean being around 8 msec. on this test and the normal limit being 20 msec.). Poor gap detection is one more factor in slow auditory processing speed and misperception of phonemes. As the frequencies are tested separately, the test is thought to reflect disorders at low levels in the auditory nervous system.
6) Dichotic Competing Sentences scores more than 3 standard deviations below the mean for each ear, a bilateral posterior temporal lobe finding.
7) SSW (Staggered Spondaic Word) test yields Reversal errors and Ear Low/High response bias 3 SD below the mean, consistent with temporal lobe dysfunction in auditory association areas anterior to primary auditory reception areas.
8) Sound Blending test scores below grade (GE = 13.1), showing some difficulty with the auditory portion of the job of sounding out words. Poor short term auditory memory caused the most problems for Ms. Ovitsky, even fairly short strings of phonemes reported as "too long" for her to identify the word.
9) Filtered Speech test scores normal, in my experience suggesting adequate auditory-visual information transfer and/or auditory closure skills. This test is considered sensitive to inefficiencies at either temporal lobe or deep parietal level.
10) PPS (Pitch Pattern Sequencing) test shows error-free perception of short tonal patterns and adequate ability to transfer that information via the corpus callosum to the dominant language centers of the opposite temporal lobe for verbal reporting (e.g. "low-high-low") -- so long as she could sing the patterns again to herself and then sing the verbal responses. When pressed to simply speak the verbal labels, as is ordinarily done on this test, she became completely undone and refused the task, on both test days..



Judith W. Paton, MA, FAAA
136 North San Mateo Drive, Suite 104
San Mateo, CA 94401
(650) 340-1280/343-7225



PATIENT'S NAME: OVITSKY, ABBY
SEX: F   AGE: 47   BIRTHDATE: 8-25-58   DATE OF TEST: 8-10-06
ADDRESS: 670 McLaughlin, Rich 94805
PHONE: (510) 464-0415
REFERRED BY:
AUDIOLOGIST:
SERVICE PROVIDED: Central Auditory Processing Eval

| | | | |
|---|---|---|---|
| KEY | AIR (MASKED) | BONE | (MASKED) |
| RIGHT | O  Δ | < | [ |
| LEFT | X  ◻ | > | ] |
| S=SOUND FIELD   A=AIDED SOUND FIELD | | | |

VALIDITY
RELIABILITY

AUDIOLOGICAL SUMMARY AND RECOMMENDATIONS:

Judith W. Paton, M. A.
Audiology – Pediatric and Adult

## CENTRAL AUDITORY TEST SUMMARY

NAME _OLITSKY, ABBY_ AGE _47_ DATE _8-10 & 8-18-06_

| TEST | NORMAL | BORDERLINE | ABNORMAL | TYPE OF ERROR |
|---|---|---|---|---|
| **PPS (Pitch Pattern Sequencing)** Singing response | 100% | | | reversals ___ naming errors ___ slow responses ___ *& could* |
| Verbal response | 100% (it allowed to sing) *loud* | | 0% *&* | extra notes ___ *not do ochay* |
| **CES (Competing Environ-mental Sounds)** Sound Patterns (W-J R) | | | | CES: naming errors ___ *fast* W-J R errors: phoneme ___ melody ___ timing ___ |
| **DPS (Duration Pattern Sequencing)** | | | | reversal errors ___ slow responses ___ extra notes ___ |
| **TCST (Time Compressed Sentence Test)** | (L) 72% *to all* | | (R) 34% *% all* | 60% compression significantly poorer score: RE *& LB* (>20%) |
| **Dichotic Competing Sentences (Willeford CAPS Battery)** | | | 0% (R) 10% (L) | Dominant ear on this task RE ___ LE ___ |
| **Competing Words (SCAN)** | | | | standard score ___ %ile ___ Ear Advantage prevalence: REH ___ % LEH ___ % |
| **Sound Blending (Woodcock-Johnson Rev)** Phonemic Synthesis (Katz) | | GE = 13.1 | | distortions ___ omissions _✓_ *word + too* perseverations ___ *long"* |
| **Filtered Speech/Words** Willeford _✓_ SCAN ___ | (R) x̄ (L) > x̄ | | | significantly poorer score: RE ___ LB ___ (Willeford) SCAN: SS ___ %ile ___ |
| **SSW (Staggered Spondaic Word) test** | | | – 35D | Ear L/H Order _/_ Total ___ Reversals _✓_ Type A ___ B ___ RNC ___ RC ___ LC ___ LNC ___ |
| **Auditory Figure-Ground (SCAN)** | | | | standard score ___ %ile ___ SCAN Auditory Age ___ |
| **Speech discrimination in ipsilateral noise (0dB S/N)** | (L) 72% | | (R) 60% | significantly poorer score: RE ___ LB ___ Poor guessing: extra syllables ___ nonsense ___ |
| **Binaural Fusion (Willeford)** | | | | significantly poorer score: RE ___ LB ___ |
| **SSI (ICM) CCM PI-PB Function** | | | ✓ | -10dB S/N RE (L) LB 60% -20dB S/N RE % LB % rollover RE ___ % LB ___ % |
| **MLD (Masking Level Difference) @ 500Hz** | | | ✓ | Release from masking: _4_ dB (ML = 14) |
| _RGDT (Random Gap Detection Test)_ | | | > 40 usec. AU 500Hz | |

th W. Paton, M. A., Clinical Audiologist
No. San Mateo Dr., Suite 104, San Mateo, CA 94401
0340-1280

Bonnie G. Reitner, Ed. D., Speech/Language Pathologist
39 North San Mateo Dr., Suite 5, San Mateo, CA 94401
(650)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

CENTRAL AUDITORY PROCESSING DISORDERS (CAPD):
Typical Problems and Possible Solutions for Adults

| Location and Characteristics | AT WORK (As might be seen) | EDUCATIONALLY | RELATING TO OTHERS |
|---|---|---|---|
| **BRAIN STEM**<br>has trouble in noise<br>short term and raw memory<br>visual, statistical, or balance<br>sx | Forgets parts of serial directions<br>Dislikes rote Procedures<br>Ignores words if engrossed<br>Makes "careless" errors in noise<br>Remembers best by logic or association | Poor foundation of main procedures<br>and other material learned by rote<br>Difficulty with foreign language, math<br>procedures, if taught by rote<br>Learns and uses poorly if entry room | Forgets routine tasks (lights, doors, picking up); seems "inconsiderate"<br>Ignores if engrossed, offending others<br>May get overwhelmed, "space out," or have<br>compulsion to do forgotten job |

> help: ENVIRONMENTAL SUPPORT (e.g. QUIET WORKSPACE, TIME FOR FREQUENT SHORT BREAKS OR CHANGE OF ACTIVITY TO MAINTAIN ATTENTION); NICAL SUPPORT (e.g. MILD-GAIN AMPLIFIERS FOR MEETINGS AND TELEPHONE; TAPE RECORDER OR COMPUTER ORGANIZER FOR REMEMBERING IDEAS, MENTS, TASKS) * KEEP ORAL DIRECTIONS SHORT; WRITE LONGER INSTRUCTIONS * TEACH COGNITIVE STRATEGIES FOR MEMORY, ORGANIZATION.

| Location and Characteristics | AT WORK | EDUCATIONALLY | RELATING TO OTHERS |
|---|---|---|---|
| **POSTERIOR**<br>ulty sounding out words<br>peller, slow reader<br>ses numbers and letters<br>ulty parsing thoughts in writing<br>used by similar-sounding words | Spelling, punctuation detract from<br>quality of written work<br>Dislikes writing, and written material such<br>as equipment manuals<br>Mis-files or writes wrong number | May hear and learn new word wrong, thus<br>confusing some information<br>Classic "dyslexic" limitations, errors<br>Tests more poorly as demands for writing<br>increase | May feel inferior because of lifelong<br>problems with school literacy and limited<br>choice of occupation<br>Misunderstandings, caused by word<br>confusions/distinctions |

> help: PROVIDE COMPUTER SPELL- AND GRAMMAR-CHECK, SECRETARY FOR HIGH-LY CLERICAL JOBS, TAPE RECORDER OR DICTA-PHONE FOR RTS * OFFER COMPLEX INFORMATION AUDITORIALLY OR HANDS-ON, RATHER THAN IN WRITING; DO DETAILED SKILLS ASSESSMENT TO REVEAL BEST TES, IN ORDER TO COUNSEL POOR SELF-IMAGE AND TO REFINE JOB DESCRIPTION AND TEACHING APPROACH, AS NECESSARY.

| Location and Characteristics | AT WORK | EDUCATIONALLY | RELATING TO OTHERS |
|---|---|---|---|
| **TERIOR/INTER-HEMISPHERIC**<br>teral word interpretation<br>ulty explaining complex ideas<br>sory, poor pragmatics<br>ues with task organization<br>many questions to clarify | Problem expressing idea if rushed<br>Misperceives complex explanation<br>Seems too inattentive, reticent<br>Others bothered by extra questions<br>Telegraphic; omits vital information | limited understanding of complex<br>lectures and reading despite good IQ<br>Needs extra time to formulate verbal<br>response, quiet in class discussion<br>May wander from the main point | May seem too terse, subordinate;<br>Language, humor too "concrete"<br>Conversation marked by long detours<br>Mismatch between question and<br>answer: tangential responses |

> help: ALLOW TIME TO COMPOSE ANSWER * REPHRASE OR CONSOLIDATE VERBAL INFORMATION (F PERSON SEEMS CONFUSED OR ANNOYED BY THY DISCOURSE * ASK FOR CLARIFICATION OF TELEGRAPHIC REMARKS * SUGGEST A "MENU" OF RESPONSES * TEACH ABSTRACT LANGUAGE ALLY (DON'T ASSUME THE PERSON WILL "GET IT BY OSMOSIS") * TEACH "CONVERSATIONAL FILLERS" TO BUY TIME FOR COMPOSING ANSWERS.

| Location and Characteristics | AT WORK | EDUCATIONALLY | RELATING TO OTHERS |
|---|---|---|---|
| **RIGHT HEMISPHERE**<br>t read speaker's mood, tone,<br>expression, or body language<br>n; poor sense of humor<br>flat, expressionless voice<br> -adhere to a task | Ability overestimated because of<br>verbal skill; may change jobs often<br>Offends others by tactlessness<br>Socially inappropriate<br>Rigid, inflexible | Math and visual-spatial problems;<br>confused by rote matter: absent layout<br>Problems w. cause and effect learning<br>Doesn't get idioms, proverbs, or<br>homonyms | "Doesn't know when to stop talking"<br>May stand too close or miss other cues to<br>proper behavior<br>Tactless; hurt people's feelings<br>Confused and depressed by failures |

> help: TEACH PRAGMATICS (E.G. COMMUNICATIVE TURN-TAKING, LEVEL OF FORMALITY AND NON-VERBAL SKILLS (E.G. BOUNDARIES, READING ESSION, CORRECT SOCIAL DISTANCE) * WRITE OUT EXACT EXPECTATIONS FOR SITUATIONS WHERE PERSON SERIOUSLY MIS-PERCEIVES PROPER L CUES * MAY NEED PSYCHOLOGICAL COUNSELING OR EDUCATIONAL THERAPY * TEACH BOUNDARIES - SOCIAL, PSYCHOLOGICAL, PHYSICAL.

*CAPDs are a mix of these types, but perhaps with one predominating, rarely having all the characteristics listed,
often occurring as part of a learning disability and/or ADD (Attention Deficit Disorder).*

Web-Based Email :: Print

https://email01.secureserver.net/view_print_multi.php?uidArray=3218.INBOX&aEmlPage0

Print | Close Window

Subject: Successful Fax Transmission to 0018664180232
From: Interfax <us@interfax.net>
Date: Sun, Nov 27, 2011 9:51 pm
To: abby@parentadvocate.org

**Transmission Results**
Destination Fax:          0018664180232
Contact Name:
Start Time:               2011/11/27 21:36:10
End Time:                 2011/11/27 21:51:05
Transmission Result:      0 - OK
Pages sent:               12
Subject:                  CWTSKY v. LACPS
CSID:                     FCC 1-866-418-0232
Duration (in Seconds):    867
Message ID:               242383259

Thank you for using Interfax
E-mail: us@interfax.net
Home page: http://www.interfax.net

Copyright © 2003-2011. All rights reserved.

1 of 1

11/27/2011 10:11 PM

EX Y

**EXHIBIT 5**

**FedEx**
*Express*
NEW Package
US Airbill

Tracking Number: 8987 1663 7140

Item 0200

Sender's Copy

**1 From** *Please print and press hard.*

Date 11/28/11

Sender's FedEx
Account Number NONE

Sender's Name Abby J. Ovitsky

Phone 503 207 0208

Company N/A (Parent Advocate)

Address 6900 SW 195th Ave #133

City Beaverton State OR ZIP 97007-5539

**2 Your Internal Billing Reference** abby@parentadvocate.org
First 24 characters will appear on invoice.

**3 To**

Recipient's Name Federal Communications Commission
Phone 888 CALL-FCC

Company Consumer & Governmental Affairs Bureau, Consumer Complaints

Address 445 12th Street, SW

Address

City Washington State DC ZIP 20554

**The FedEx US Airbill has changed. See Section 4.**
For shipments over 150 lbs., order the new FedEx Express Freight US Airbill.

**4 Express Package Service** *To most locations.*
NOTE: Service order has changed. Please select carefully.

Packages up to 150 lbs.
For packages over 150 lbs., use the new FedEx Express Freight US Airbill.

**Next Business Day**

☐ FedEx First Overnight
Earliest next business morning delivery to select locations. Friday shipments will be delivered on Monday unless SATURDAY Delivery is selected.

☐ FedEx Priority Overnight
Next business morning.* Friday shipments will be delivered on Monday unless SATURDAY Delivery is selected.

☐ FedEx Standard Overnight
Next business afternoon.*
Saturday Delivery NOT available.

**2 or 3 Business Days**

☐ NEW FedEx 2Day A.M.
Second business morning.*
Saturday Delivery NOT available.

☐ FedEx 2Day
Second business afternoon.* Thursday shipments will be delivered on Monday unless SATURDAY Delivery is selected.

☒ FedEx Express Saver
Third business day.*
Saturday Delivery NOT available.

**5 Packaging** *Declared value limit $500.*

☒ FedEx Envelope*  ☐ FedEx Pak*  ☐ FedEx Box  ☐ FedEx Tube  ☐ Other

**6 Special Handling and Delivery Signature Options**

☐ SATURDAY Delivery
NOT available for FedEx Standard Overnight, FedEx 2Day A.M., or FedEx Express Saver.

☒ No Signature Required
Package may be left without obtaining a signature for delivery.

☐ Direct Signature
Someone at recipient's address may sign for delivery. *Fee applies.*

☐ Indirect Signature
If no one is available at recipient's address, someone at a neighboring address may sign for delivery. For residential deliveries only. *Fee applies.*

Does this shipment contain dangerous goods?
One box must be checked.

☒ No  ☐ Yes As per attached Shipper's Declaration.  ☐ Yes Shipper's Declaration not required.  ☐ Dry Ice Dry Ice, 9, UN1845 ___ x ___ kg
Dangerous goods (including dry ice) cannot be shipped in FedEx packaging or placed in a FedEx Express Drop Box.
☐ Cargo Aircraft Only

**7 Payment** *Bill to:*

Enter FedEx Acct. No. or Credit Card No. below.

☐ Sender Acct. No. in Section 1 will be billed  ☐ Recipient  ☐ Third Party  ☒ Credit Card  ☐ Cash/Check

FedEx Acct. No.
Credit Card No.
Exp. Date

Total Packages ___  Total Weight .5 lbs.  Total Declared Value$ 100 .00

Our liability is limited to $100 unless you declare a higher value. See back for details. By using this Airbill you agree to the service conditions on the back of this Airbill and in the current FedEx Service Guide, including terms that limit our liability.

612

Rev. Date 11/10 • Part #158136 • ©1994-2010 FedEx • PRINTED IN U.S.A. SKV

5. May 2009 Social Security "Fully Favorable" Ruling finds that I am "severely hearing impaired," qualify for social security disability RETOACTIVELY TO 2006 based on deafness.

6. 12/30/08 at 13:18 saved TRS call with Sylvia Hernandez, who called me from Los Angeles County civil rights to "investigate" above claims, and she initiated call to me on TRS/relay, so County had the correct working TRS number.

7. 01/02/09 at 09:38 saved TRS call with Sylvia Hernandez, who called me from Los Angeles County civil rights to "investigate" above claims, and she initiated call to me on TRS/relay, so County had the correct working TRS number.

Each time I attempted to "follow up" by TRS I was told either "this is a COUNTY OF LOS ANGELES MATTER, TALK TO THEM" or "this is a DFEH matter, TALK TO THEM."

I was available to communicate by TRS and/or email at all times, I made many efforts to contact these investigators. I did not receive any right to sue letter for LAPD at all and did not receive the two "right to sue" letters aforementioned until October 17, 2011.

The County, CPS, Mental Health and the City were both put on notice IMMEDIATELY in 2008 that I perceived ADA violations and that these were ongoing. I was not able to communicate effectively with the investigators because they each neglected to use the TRS numbers (none ever blocked, all working and all numbers will forward messages to the SAME email account, abby@parentadvocate.org, which has not changed and has always been working without fail since Summer 2008, when I created a site to help parents be better parents. The website is not now active, but email has always been active, and the website did not go down until late 2010. I also published my email and TRS number on FaceBook since 2009.

11/27/2011 7:13:49 PM

2 | **Attachment to FORM 2000C--FCC Complaint (Title IV)**
**Ovitsky v. DFEH/STATE OF CALIFORNIA**

**Attachment to FORM 2000C--FCC Complaint (Title IV)**

**Ovitsky v. DFEH/STATE OF CALIFORNIA**

In support of this complaint, I can produce for your review the following
supportive evidence:

1. 10.17.11 email from Lottie Woodruff at DFEH, mentions only 2 of the 3 claims,
attaches "right to sue" letters dated 10.1.09 never before seen or received by me,
for U200809S0646-00p (case against CPS), and for U200809S0644-00p (Mental
Health), the police claim, U200809S0645-00p is not mentioned. (MY EMAIL
ADDRESS HAS NOT CHANGED SINCE 2008)

2. Two "right to sue" letters dated 1.10.09 not received by me until 10.17.11, two
years after they were allegedly sent to my old address in Los Angeles by DFEH.

3. 2.09.10 email from Christine Collins at DFEH, investigating another noise
claim that year.

4. September 2009 letters (four letters with dates 9.14.09-9.24.09), from Robert
Hammock, "consultant," all sent to the old address in Los Angeles by DFEH,
states he was looking for a "phone number of record" states there is none (false,
see below) also states that I was "yelling" at Sandra Holguin on a relay call, which
is impossible, my end of all relay (TRS) calls is 100% written. Other statements in
the letters that are false: I was not "happy" with anyone's "assistance," Pellerin
did not "comply," Dario had committed sex harassment and was reported for it;
absolutely no effort was ever made for a quiet room at CPS, real time captioning
(CART) was avoided by all staff/court personnel who refused to cooperate with it,
instead holding "private" court in chambers with Commissioner Trendacosta, I
never made any "changes," the County did, unannounced or last minute changes
regarding visit times, locations, changes in foster location, schools, etc. At no time
did I state I am mute, I am not mute, I am "severely hearing impaired." I hear
distorted sound and cannot understand what is spoken to me.

**Attachment to FORM 2000C--FCC Complaint (Title IV)**
**Ovitsky v. DFEH/STATE OF CALIFORNIA**

f. Name of program(s) involved: _____

_____

7. Briefly describe your complaint and include the resolution you are seeking.  If applicable, provide a full description of the telecommunications equipment or customer premises equipment (CPE) and/or the telecommunications service about which the complaint is made, and the date or dates on which the complainant either purchased, acquired or used, or attempted to purchase, acquire or use the telecommunications equipment, CPE or telecommunications service about which the complaint is being made.  Re: U200809-S-0646-00ap (CPS), U200809-S-0645-00ap (LAPD), and U200809-S-0644-0 (Mental Health), failure of Robert Hammock "Consultant," to use TRS relay and/or email to communicate about case.  DFEH at all times had working TRS and email, failed to use.

## Form 2000C  - Disability Access Complaint

You may submit this form over the Internet at http://esupport.fcc.gov/complaints.htm, by e-mail to fccinfo@fcc.gov, by fax to 1-866-418-0232, or by postal mail to:

> Federal Communications Commission
> Consumer & Governmental Affairs Bureau
> Consumer Complaints
> 445 12th Street, SW
> Washington, D.C. 20554

In addition, you may submit your complaint over the telephone by calling 1-888-CALL-FCC or 1-888-TELL-FCC (TTY). If you choose to submit your complaint over the telephone, an FCC customer service representative will fill out an electronic version of the form for you during your conversation. If you have any questions, feel free to contact the FCC at 1-888-CALL-FCC or 1-888-TELL-FCC (TTY).

### FCC NOTICE REQUIRED BY THE PAPERWORK REDUCTION ACT AND THE PRIVACY ACT

The Federal Communications Commission is authorized under the Communications Act of 1934, as amended, to collect the personal information that we request in this form. This form is used for complaints that involve disability access. The public reporting for this collection of information is estimated to average 30 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the required data, and completing and reviewing the collection of information. If you have any comments on this burden estimate, or how we can improve the collection and reduce the burden it causes you, please write to the Federal Communications Commission, OMD-PERM, Paperwork Reduction Project (3060-0874), Washington, DC 20554. We will also accept your comments regarding the Paperwork Reduction Act aspects of this collection via the Internet if you send them to PRA@fcc.gov. PLEASE DO NOT SEND YOUR COMPLETED FORMS TO THIS ADDRESS.

Remember - You are not required to respond to a collection of information sponsored by the Federal government, and the government may not conduct or sponsor this collection, unless it displays a currently valid OMB control number or if we fail to provide you with this notice. This collection has been assigned an OMB control number of 3060-0874.
In addition, the information that consumers provide when filling out FCC Form 2000 is covered by the system of records notice, FCC/CGB-1, Informal Complaints and Inquiries File (Broadcast, Common Carrier, and Wireless Telecommunications Bureau Radio Services). The Commission is authorized to request this information from consumers under 47 U.S.C. 206, 208, 301, 303, 309(e), 312, 362, 364, 386, 507, and 51; and 47 CFR 1.711 et seq.

Under this system of records notice, FCC/CGB-1, the FCC may disclose information that consumers provide as follows: when a record in this system involves a complaint against a company, the complaint is forwarded to the defendant who must, within a prescribed time frame, either satisfy the complaint or explain to the Commission and the complainant its failure to do so; where there is an indication of a violation or potential violation of a statute, regulation, rule, or order, records from this system may be referred to the appropriate Federal, state, or local agency responsible for investigating or prosecuting a violation or for enforcing or implementing the statute, rule, regulation, or order; a record from this system may be disclosed to a Federal agency, in response to its request, in connection with the hiring or retention of an employee, the issuance of a security clearance, the reporting of an investigation of an employee, the letting of a contract, or the issuance of a license, grant or other benefit; a record on an individual in this system of records may be disclosed, where pertinent, in any legal proceeding to which the Commission is a party before a court or administrative body; a record from this system of records may be disclosed to the Department of Justice or in a proceeding before a court or adjudicative body when: (a) the United States, the Commission, a component of the Commission, or, when represented by the government, an employee of the Commission is a party to litigation or anticipated litigation or has an interest in such litigation, and (b) the Commission determines that the disclosure is relevant or necessary to the litigation; a record on an individual in this system of records may be disclosed to a Congressional office in response to an inquiry the individual has made to the Congressional office; a record from this system of records may be disclosed to GSA and NARA for the purpose of records management inspections conducted under authority of 44 U.S.C. 2904 and 2906. Such disclosure shall not be used to make a determination about individuals.

In each of these cases, the FCC will determine whether disclosure of the information in this system of records notice is compatible with the purpose for which the records were collected. Furthermore, information in this system of records notice is available for public inspection after redaction of information that could identify the complainant or correspondent, i.e., name, address and/or telephone number.

THE FOREGOING NOTICE IS REQUIRED BY THE PAPERWORK REDUCTION ACT OF 1995, PUBLIC LAW 104-13, OCTOBER 1, 1995, 44 U.S.C. SECTION 3507 AND THE PRIVACY ACT OF 1974, PUBLIC LAW 93-579, DECEMBER 31, 1974, 5 U.S.C. SECTION 552a(e)(3).

## Form 2000C - Disability Access Complaint
### * * * ANSWER EACH QUESTION THAT APPLIES TO YOUR SPECIFIC COMPLAINT * * *

2. Provide the name, address and telephone number (if known) of the company(s) involved in your complaint:

   Name: State of California-Department of Fair Employment and Housing

   City:  Los Angeles                    State: CA    Zip Code: 90017 -

   Telephone number: ( 213 ) 439 - 6799

3. If your complaint is about accessibility of telecommunications services or equipment, provide the make and model number of the equipment or device that this complaint is about:
   Nextalk/URRELAY (TRS)

4. If your complaint is about closed captioning or emergency information on television, provide the date (mm/dd/yyyy) __ / __ / ____    and time _____    ⃝ AM   ⃝ PM
   and any details of when the event or action you are complaining about occurred:

   _____

   _____

5. If your complaint is about access to emergency information on television, provide the following information:
   a. Television station call sign and network name (if applicable), or channel name
      (*e.g.*, "WZUF, CBC," "WZUE-TV," "Sportingchannel West"): _____
   b. Channel (*e.g.*, "13"): _____
   c. Station or subscription TV provider system location: City: _____
      County: _____    State: ____
   d. Date(s) and time(s) of emergency: ___ / ___ / _____    and time _____    ⃝ AM   ⃝ PM
   e. Detailed description of the emergency (*i.e.*, flood, hurricane, tornado, etc., as well as the areas in which the emergency occurred): _____

      _____

      _____

6. If your complaint is about closed captioning, provide the following:
   a. Television station call sign and network name (if applicable), or channel name
      (*e.g.*, "WZUF, CBC," "WZUE-TV," "Sportingchannel West"): _____
   b. Channel (*e.g.*, "13"): _____
   c. Station or subscription TV provider system location: City: _____
      County: _____    State: ____
   d. If you pay to receive television programming, type of subscription service (*e.g.*, cable, satellite):

      _____

   e. If you pay to receive television programming, name of company to whom you subscribe:

      _____

February 2010

Print Form

Approved by OMB
3060-0874
Estimated time per response: 30 minutes

## Form 2000C - Disability Access Complaint

### Consumer's Information:

First Name: ABBY                          Last Name: OVITSKY

Company Name: N/A (parentadvocate)

(Complete only if you are filing this complaint on behalf of a company or an organization.)

Street Address or Post Office Box Number: 6900 SW 195TH AVE #133

City: BEAVERTON                    State: OR    Zip Code: 97007 - 5539

Telephone Number (Residential or Business): (   )   -        Ext:

E-mail Address: ABBY@PARENTADVOCATE.ORG

Are you filing information on behalf of another party, such as client, parent, spouse or roommate?

☐ Yes  ☑ No   If yes, complete items a through g.

a. Your relationship with the party: _____

b. The party's first name: _____

c. The party's last name: _____

d. The party's daytime phone number: (   )   -      Ext:

e. The party's street address or post office box number: _____

f. City: _____  State: ____  Zip Code: ____ - ____

g. E-mail Address: _____

***IMPORTANT***: Please indicate the preferred format or method of response to the complaint by the Commission and defendant: ☐ Letter  ☐ Facsimile (fax)  ☐ Telephone Voice  ☐ TTY  ☑ Internet E-mail  ☐ ASCII Text  ☐ Audio-Cassette Recording  ☐ Braille  ☐ TRS (designate form of TRS and appropriate contact information) _____

\* \* \* ANSWER EACH QUESTION THAT APPLIES TO YOUR SPECIFIC COMPLAINT \* \* \*

1. Check the appropriate box for your type of complaint:

☑ Telecommunications Relay Service (TRS)
*(i.e.,* TTY-based, IP Relay, CapTel, IP CapTel, Speech-to-Speech, Video Relay Service (VRS))

☐ Accessibility of emergency information on television

☐ Closed Captioning

☐ Wireless telephone equipment or service (includes hearing aid compatibility and other accessibility issues)

☐ Wireline telephone equipment or service (includes hearing aid compatibility and other accessibility issues)

February 2010